**FILED**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

MAY - 5 2017

Clerk, U.S. Bankruptcy,
Orlando Division

In re:                                             Case No.    6:17-BK-00046-CCJ

ERMINIO VAN MALLEGHEM                               Chapter:    13
          Debtor
_____/

## DEBTOR'S MOTION TO TAKE JUDICIAL NOTICE

Comes now ERMINIO VAN MALLEGHEM , (hereinafter the "VAN MALLEGHEM" or Debtor), without an attorney, hereby moves the Court TO TAKE JUDICIAL NOTICE. In support VAN MALLEGHEM states as follows:

1.      The Chapter 13 petition followed a discharge the debtor received.

2.      On December 27, 2016, the bankruptcy court closed the Chapter 7 case.

3.      On January 4th, 2017, Debtor has filed a petition under chapter 13 of the United Stated Bankruptcy Code.

4.      On January 13, 2017, Ocwen Loan Servicing LLC filed a motion to dismiss the chapter 13 case for an alleged bad faith by debtor.

5.      The Court set the motion for an evidentiary hearing scheduled for April 19, 2017.

6.      On or about April 6, 2017, in preparation for the evidentiary hearing, Debtor propounded discovery upon Ocwen Loan Servicing LLC.

7.      Instead of responding, on or about April 13, 2017, Ocwen Loan Servicing LLC filed a motion to strike discovery requests.

1

8.    In accordance with Federal Rules of Evidence, Rule 201(b)(1) a "court may judicially notice a fact that is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction."

9.    Under section (b)(2) of Rule 201, a "court may judicially notice a fact that is not subject to reasonable dispute because it:

> (1)  is generally known within the trial court's territorial jurisdiction; or
>
> (2)  can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

10.    . It is further provided in Rule 201(c), subsection (2) that:

> A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." (Emphasis added).

11.    The documents for which Debtor requests that judicial notice be taken are relevant to the instant proceedings and which are public records.

12.    Debtor requests that the Court take judicial notice of the following documents, copies of which are attached:

> A.    COMPLAINT: CONSUMER FINANCIAL PROTECTION BUREAU *vs* OCWEN, Case No. 9:17-CV-80495 (Exhibit "A")
>
> B.    CLASS ACTION COMPLAINT: KAREN A. CARVELLI, Individually and On Behalf of All Others Similarly Situated, *vs* OCWEN FINANCIAL CORPORATION, RONALD M. FARIS, and MICHAEL R. BOURQUE JR., (Exhibit "B")
>
> C.    CEASE AND DESIST ORDER: STATE OF NORTH CAROLINA; IN THE MATTER OF: OCWEN LOAN SERVICING, LLC, Docket No. 17:025:MBB, (Exhibit "C")

13.    The above documents are not reasonably subject to dispute and are relevant to the Debtor's opposition to OCWEN's Motion to Dismiss as they indicate the violations Debtor claims

have been committed by OCWEN and demonstrate OCWEN'S actions in pursuing Debtor personally in violation of the discharge injunction order issued by this Court.

WHEREFORE, ERMINIO VAN MALLEGHEM respectfully requests that the Court take judicial notice of the above documents pursuant to Fed. R. Evidence 201 and other applicable law, and for any further relief this Court deems proper.

Dated: May 5, 2017

Respectfully submitted,

Erminio Van Malleghem, Pro Se

## CERTIFICATE OF SERVICE

We The undersigned herby certifies that a true and correct copy of the foregoing has been furnished by U.S. Mail and/or email to: the parties on the service list on this date May 5, 2017.

Respectfully submitted,

Erminio Van Malleghem, Pro Se
14203 Hogan Drive
Orlando, FL 32837
Tel. (407) 376-9528
*info@vanm.net*

**SERVICE LIST**: 6:17-BK-00046-CCJ

Laurie K. Weatherford
Chapter 13 Trustee
PO Box 3450
Winter Park, FL 32790
*ecfdailysummary@c13orl.com*

Robertson, Anschutz & Schneid, P.L.
Authorized Agent for Bank of America NA
6409 Congress Ave., Suite 100
Boca Raton, FL 33487
*cguner@rasmonitor.com*

Van Ness Law Firm, PLC
Marian Kennady, Esquire
1239 E. Newport Center Drive, Suite 110
Deerfield Beach, FL 33442
*bankruptcy@vanlawfl.com*

4

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No. 9:17-CV-80495

CONSUMER FINANCIAL PROTECTION BUREAU,
    Plaintiff,

vs.

OCWEN FINANCIAL CORPORATION,
    a Florida corporation,

OCWEN MORTGAGE SERVICING, INC.,
    a U. S. Virgin Islands corporation, and

OCWEN LOAN SERVICING, LLC,
    a Delaware limited liability company,

    Defendants.

---

**COMPLAINT**

1.    The Consumer Financial Protection Bureau ("Bureau") brings this action against Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC (collectively "Ocwen" or "Defendants") under Sections 1054 and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5564 and 5565. Ocwen is one of the largest mortgage servicers in the United States. The Company specializes in servicing the loans of distressed borrowers. It committed numerous violations of Federal consumer financial laws that have harmed borrowers. Among other things, Ocwen has improperly calculated loan balances, misapplied borrower payments, failed to correctly process escrow and insurance payments, and failed to properly investigate and make corrections in response to consumer complaints. Ocwen has

1

# Exhibit A

compounded these failures by illegally foreclosing upon borrowers' loans and selling

loan servicing rights to servicers without fully disclosing or correcting errors in

borrowers' loan files.

      2.      The Bureau brings this action against the Defendants under: (1) Sections

1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536; (2) Sections 807(2)(a), 807(10),

and 808 of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e(2)(a), 1692e(10),

and 1692f (the "FDCPA"); (3) Sections 6 and 19 of the Real Estate Settlement

Procedures Act ("RESPA"), 12 U.S.C. §§ 2605, 2617, and the regulations promulgated

thereunder at Regulation X, 12 C.F.R. part 1024 ("Regulation X"); (4) Section 105(a) of

the Truth in Lending Act ("TILA"), 15 U.S.C. § 1604(a), and the regulations promulgated

thereunder at Regulation Z, 12 C.F.R. part 1026 ("Regulation Z"); and (5) Section 3(b) of

the Homeowners Protection Act of 1998, 12 U.S.C. § 4902(b) (the "HPA").

      3.      The Bureau brings this action to obtain permanent injunctive relief,

restitution, refunds, disgorgement, damages, civil monetary penalties, and other relief

for the Defendants' violations of Federal consumer financial law.

## JURISDICTION AND VENUE

      4.      The Court has subject-matter jurisdiction over this action because it is

brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal

question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. §

1345.

      5.      Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. §

5564(f) because Defendants are located in or do business in this district and part of the

events giving rise to the claims took place in this district.

# Exhibit A

## PLAINTIFF

6.    The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). The Bureau is charged with enforcing Federal consumer financial laws. 12 U.S.C. §§ 5563, 5564.

7.    The CFPA is a Federal consumer financial law. 12 U.S.C. § 5481(14). Under Sections 1031 and 1036 of the CFPA, it is unlawful for any covered person to commit or engage in unfair, deceptive, or abusive acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

8.    The FDCPA, RESPA, TILA, and HPA are Federal consumer financial laws. 12 U.S.C. § 5481(14). Under Section 1036 of the CFPA, it is unlawful for any covered person "to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C § 5536(a)(1)(A). Violations of the FDCPA, RESPA, TILA, and HPA are therefore violations of Section 1036 of the CFPA. 12 U.S.C § 5536(a)(1)(A).

9.    The Bureau is authorized to commence civil actions in federal district court, in its own name, to address violations of Federal consumer financial law, including violations of the CFPA. 12 U.S.C. § 5564(a) and (b).

## DEFENDANTS

10.    Ocwen Financial Corporation ("OFC") is a publicly-traded Florida corporation that maintains its principal place of business in West Palm Beach, Florida. At all times relevant to this complaint, OFC has done business in this District and throughout the United States.

# Exhibit A

11.    Ocwen Mortgage Servicing, Inc. ("OMS") is a United States Virgin Island corporation that maintains its principal place of business in the United States Virgin Islands. At all times relevant to this complaint, OMS has done business in this District and throughout the United States.

12.    Ocwen Loan Servicing, LLC ("OLS") is a Delaware limited liability company that maintains its principal place of business in West Palm Beach, Florida. At all times relevant to this complaint, OLS has done business in this District and throughout the United States.

13.    OFC, through its subsidiaries, originates and services loans. OFC, OMS, and OLS (collectively "Ocwen") engage in servicing activities relating to the loans by, among other things, processing borrower payments, administering loss mitigation processes, and managing foreclosures. Ocwen also acquires and collects upon borrowers' mortgage debts that are in default.

14.    OFC, the parent and publicly-traded company, wholly owns all of the common stock of its primary operating subsidiary, OMS. OMS wholly owns the stock of another of OFC's primary operating subsidiaries, OLS. All three entities share and have shared key executives, such as Ronald Faris, Timothy Hayes, Michael Bourque, and John Patrick Cox. All three entities, through OFC, file a consolidated financial statement with OFC's public disclosures.

15.    OFC controls, directs, operates, and participates in mortgage servicing activities, including the daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations for Ocwen's loans. OFC enters into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. OFC has contracted for such products and services, including a

4

# Exhibit A

system of record and related technology services, for and on behalf of Ocwen's affiliates, which include OMS and OLS.

16.    OMS is also engaged in servicing loans. OMS is licensed by numerous state regulators to service loans and collect mortgage debts. OMS has entered into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. OMS has contracted for such products and services, including a system of record and related technology services used by OLS and OFC. OLS also represented, in an August 23, 2016 Consent Order with the State of Washington Department of Financial Institutions, that OMS engages in the servicing or subservicing of OLS loans.

17.    OLS is also engaged in servicing loans. OLS is licensed by numerous state regulators to service loans and collect upon borrowers' mortgage debts. OLS is also the owner of the mortgage servicing rights for the loans that Ocwen services.

18.    Under OFC's and OMS's direction, authority, and control, OLS has also engaged in the marketing and processing and transmitting of payments for credit monitoring products, financial advisory products, and other products that are added on to Ocwen borrowers' accounts.

19.    OFC, OMS, and OLS are, and have been at all times relevant to this Complaint, "covered persons," as that term is defined by 12 U.S.C. § 5481(6)(A), because they offer or provide a consumer financial product or service for use by consumers primarily for personal, family, or household purposes, or that is delivered, offered, or provided in connection with such a product or service by: servicing mortgage loans; collecting on consumers' mortgage debts; and marketing and processing and transmitting payments for credit monitoring products, financial advisory products, and

# Exhibit A

other products that are added on to the accounts of borrowers whose loans they service ("add-on products"). 12 U.S.C. § 5481(15)(A)(i), (iv), (vii), (viii), and (x).

20.    OFC is, and has been at all times relevant to this Complaint, a "related person" because, as described in Paragraph 14, it is the direct and indirect shareholder of all OMS and OLS stock, and is thus a "controlling shareholder" and "shareholder...or other person...who materially participates in the conduct of the affairs" of OMS and OLS, which are covered persons.  12 U.S.C. § 5481(25)(C)(i) and (ii). OFC is thus "deemed to [be] a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B). OMS is, and has been at all times relevant to this Complaint, a "related person" because, as described in Paragraph 14, it owns all of OLS's stock and is thus a "controlling shareholder" and a "shareholder...or other person...who materially participates in the conduct of the affairs" of OLS, which is a covered person. 12 U.S.C. § 5481(25)(C)(i) and (ii). OMS is thus "deemed to [be] a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

21.    OFC and OMS are, and have been at all times relevant to this Complaint, service providers to OLS because, as described in Paragraphs 15 and 16, OFC and OMS have provided material services to OLS. 12 U.S.C. § 5481(26)(A). OFC and OMS have also controlled and participated in the design, operation, and maintenance of OLS's mortgage servicing activities and marketing and processing and transmitting payments for add-on products. 12 U.S.C. § 5481(26)(A)(i).

22.    OLS, OMS, and OFC operate as a "common enterprise." OLS, OMS, and OFC have conducted the business practices described below through interconnected companies that have common business functions, employees, and office locations. OFC and OMS control (either formally or informally) and operate OLS's mortgage servicing

# Exhibit A

activities and marketing of and payment processing and transmitting payments for add-on products. OFC and OMS also contract for critical mortgage servicing operations for and on behalf of OLS. OFC, OMS, and OLS also file consolidated financial statements and share employees and offices. Accordingly, an act by one entity constitutes an act by each entity comprising the "common enterprise," and OFC, OMS, and OLS are each jointly and severally liable for the acts and practices alleged below.

23.     As described in Paragraphs 14-18, OFC and OMS have directed and controlled OLS's mortgage servicing activities and marketing of and payment processing and transmitting payments for add-on products, and authorized OLS to service Ocwen's loans. Employees of OFC and OMS have knowledge of and control or have the ability to control the activities of OLS discussed herein. OFC and OMS, as OLS's principals, are liable for the actions of their agent, OLS.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND

#### A.     Company background.

24.     William Erbey formed Ocwen in 1988. He served as the Company's Chief Executive Officer until 2010. Ronald Faris succeeded Erbey and continues to serve as Ocwen's Chief Executive Officer.

25.     Between 2010 and the first quarter of 2014, Ocwen's residential servicing portfolio grew from 351,595 loans with an aggregate unpaid principal balance of approximately $50 billion to 2,861,918 loans with an aggregate unpaid principal balance of approximately $465 billion. Ocwen's largest acquisition during this time period was its 2013 purchase of Residential Capital, LLC's ("Residential Capital") servicing platform and its mortgage servicing rights to 1,740,000 loans with an aggregate unpaid principal

7

# Exhibit A

balance of approximate $183.1 billion. As of December 31, 2016, Ocwen serviced approximately 1,393,766 loans with an aggregate unpaid principal balance of approximately $209 billion. Its loans are located in all fifty states and the District of Columbia.

26.    Borrowers do not choose their mortgage servicer and have no control over whether and how Ocwen services their loans.

**B.    Ocwen's REALServicing System of Record.**

27.    Fundamental functions of a mortgage servicer include processing and applying borrower payments, communicating accurate payment information to borrowers, managing escrow accounts, and maintaining accurate loan balance information.

28.    Servicers also respond to borrower inquiries, handle loss mitigation requests, and initiate foreclosure proceedings, among other functions.

29.    To perform these tasks, servicers input loan and borrower information into electronic databases, often referred to as systems of record. Systems of record are essential to a servicer's ability to service loans in accordance with applicable legal requirements. If the information the servicer inputs into the system of record is inaccurate, or the system itself has deficiencies that produce inaccurate information even when the servicer inputs correct information, a servicer can make critical errors that harm borrowers.

30.    Ocwen has used and continues to use a proprietary system of record, REALServicing, and its related sub-systems (collectively "REALServicing").

31.    In 2009, Ocwen spun off its internal technology department into a separate company, Altisource Portfolio Solutions ("Altisource"). As a result of this spin-

8

# Exhibit A

off, Altisource owns and maintains the REALServicing platform. Ocwen has contracted with Altisource for technology services. In 2012 and 2013, while Erbey was the Chairman of the Boards of both Altisource and Ocwen, Ocwen extended this technology-services contract through 2025.

32.    No other mortgage servicer uses REALServicing.

## II.    OCWEN HAS SERVICED LOANS BASED ON INACCURATE AND INCOMPLETE BORROWER LOAN INFORMATION

33.    As set forth in greater detail below, Ocwen has serviced loans and collected upon debts based on inaccurate and incomplete borrower loan information. Ocwen has often input inaccurate and incomplete information, or failed to input accurate or complete information, about borrowers' loans into its REALServicing system of record. Even when the information in REALServicing has been accurate, REALServicing has generated inaccurate information about borrowers' loans due to system deficiencies. Because of these system deficiencies, Ocwen has had to rely upon manual processes and workarounds that have themselves resulted in errors in borrowers' loan information.

34.    Ocwen's use of inaccurate and incomplete information to collect mortgage, tax, and insurance payments, communicate with borrowers about loss mitigation issues, proceed with foreclosures, and when selling the servicing rights of borrowers' loans to new servicers has resulted in significant harm to borrowers.

### A.    Ocwen loaded inaccurate and incomplete information into REALServicing and serviced loans using this information.

35.    When Ocwen acquires servicing rights for loans, it moves, or "boards," the records for those loans from the prior servicers' systems of record onto REALServicing.

36.    As described in Paragraph 25, between 2010 and 2014, Ocwen acquired the rights to service millions of residential loans, including more than 1.7 million

# Exhibit A

Residential Capital loans. Ocwen inputted inaccurate and incomplete loan information

and payment data from these acquisitions into REALServicing.

> 1.    *Ocwen boarded inaccurate and incomplete loan and payment data*
> *from prior servicers into REALServicing.*

37.    In many instances, the systems of record that other servicers use contain

data fields that are different from the data fields in REALServicing. To check whether it

is correctly boarding loan data from the prior servicer's systems onto REALServicing,

Ocwen verifies critical loan data fields—such as interest rate, property type, and unpaid

principal balance—by matching it with the information in the borrower's loan

documentation. If the information in REALServicing does not match what Ocwen finds

in the documents, Ocwen is supposed to correct the error in REALServicing.

38.    To ensure the loan data it is using to service loans is complete and

accurate, Ocwen seeks to complete this loan verification process within 60 days of

boarding the loan onto REALServicing. Since 2014, however, Ocwen has not completed

this process within 60 days. Instead, it has relied on unverified loan information for

months—and often for more than a year—to service hundreds of thousands of loans.

39.    As of December 2013, Ocwen had a backlog of more than 400,000

transferred loans that remained unverified. It did not finish verifying and making

corrections to critical data fields for these loans until August 31, 2014. Due to this

backlog, Ocwen also delayed verifying the 1.7 million Residential Capital loans it

previously acquired in 2013, and which it moved from Residential Capital's servicing

platform and boarded onto REALServicing on a rolling basis beginning in early 2014.

Ocwen did not even begin the verification process for the Residential Capital loans until

September 1, 2014; at that time, Ocwen was servicing more than 1.1 million unverified

# Exhibit A

Residential Capital loans on REALServicing. By the end of 2014, when Ocwen
completed boarding Residential Capital loans onto REALServicing, the verification
backlog had grown to more than 1.3 million unverified Residential Capital loans. As of
April 2016, Ocwen still had a backlog of more than 263,000 unverified Residential
Capital loans.

40.    In November 2014, Ocwen determined that it was taking, on average, 261
days to complete its verification process for each loan it boarded. In some cases, the
verification process has taken more than a year, far beyond Ocwen's expected 60-day
time period.

41.    As of 2014, in addition to boarding loans with inaccurate loan information,
Ocwen also boarded loans that contained payment history data that it had reason to
believe was inaccurate or incomplete. Ocwen, for example, boarded incomplete or
incorrect payment histories onto REALServicing, such as payment histories that include
misapplied payments and transactions that occurred before the loan was even
originated.

42.    As of 2014, Ocwen had also failed to verify whether the prior servicers'
corporate advances or fees for servicing-related expenses—such as attorneys' fees,
property inspection fees, property preservation fees, force-placed insurance charges,
and foreclosure-related expenses—were valid and actually owed by borrowers. In many
instances, Ocwen has charged borrowers for these charges and fees, even though neither
Ocwen nor the prior servicer had invoices or other documents to support these charges
and fees, and even though Ocwen was receiving disputes from borrowers claiming that
these charges or fees were not owed.

11

# Exhibit A

43.    For example, in December 2014, when Ocwen reviewed loans it had boarded the previous year, it determined that it was missing invoices or other documents to support $98 million in corporate advances that it had charged to borrowers. In June 2015, Ocwen also learned that it did not have documentation to support $58 million out of $85 million in corporate advances that it had charged to borrowers whose loans it transferred to new servicers.

> 2.    *As a result of Ocwen's verification failures, Ocwen has serviced thousands of loans based on incorrect information.*

44.    Because Ocwen failed to verify the accuracy and completeness of borrowers' loan data during its expected 60-day time period after boarding, it has delayed correcting any loan data errors or incomplete loan information. As a result of the delay—in many instances, more than a year—Ocwen serviced a significant number of loans based on inaccurate loan information.

45.    According to Ocwen, which tracked the results of its verification of loans from 2014 through at least April 2016, a significant percentage of the loans it ultimately verified contained errors or incomplete information and required corrections. For example, in April 2014, Ocwen reported that 72 percent of the loans it verified that month contained errors or incomplete information and required corrections in REALServicing. In March 2016, 90 percent of the loans Ocwen verified contained errors or incomplete information that required corrections.

46.    As a result of the findings of its verification process, from September 2014 until April 2016, Ocwen determined that it needed to make more than 870,000 corrections in REALServicing, including, more than: 43,000 corrections to the maximum late fees a borrower could be charged (under state law); 31,000 corrections to

# Exhibit A

loans' maturity dates; 27,000 corrections to loan terms; 24,000 corrections to loans' first interest rate cap maximum; and 5,000 corrections to loans' interest rates.

47.    Even when Ocwen completed its verification process and identified inaccuracies in loan data, in many instances, Ocwen has failed to accurately correct the errors in REALServicing. For example, in November 2014, Ocwen conducted an internal audit and found that its loan verification personnel were not properly correcting or updating the information in REALServicing in 63 percent of loans the audit team reviewed. The audit found that Ocwen personnel had failed to properly correct critical data fields such as loan maturity date, loan term, first payment date, balloon term, and first interest rate cap.

48.    In 2015, Ocwen's outside consultant identified additional deficiencies in Ocwen's loan boarding process, such as:

- "High volume of loans error out of the automated process for unknown reasons requiring manual revision";

- "Limited available data fields cause various groups to use and reuse same fields for different information"; and

- "Limited system functionality in place to accommodate SCRA [Servicemembers Civil Relief Act] requirements (e.g., unable to stop fees if fee was in place prior to customer becoming SCRA eligible)."

# Exhibit A

**B.    Ocwen's reliance on its deficient servicing platform, REALServicing, has exacerbated its use of inaccurate loan information.**

> 1.    *Ocwen and its outside consultant have concluded that REALServicing is failing.*

49.    Ocwen's own senior leadership has repeatedly recognized and acknowledged REALServicing's failures.

50.    For example, in an internal communication in 2014 with Ocwen's Chief Executive Officer, Ocwen's Head of Servicing described Ocwen's technology as:

> **An absolute train wreck. I know there's no shot in hell, but if I could change systems tomorrow I would.** I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling. I'm not talking about differentiators here. I'm talking about getting system to stay online, escrow analysis to work, letters to print, etc. It's ridiculous. (Emphasis added.)

51.    Ocwen's former Head of Servicing Compliance testified in May 2016 that she was "absolutely" concerned that Ocwen could not service loans on REALServicing in compliance with applicable laws when she worked at the company between 2014 and 2015. She testified that she, other members of the Compliance Department, and the leaders of Servicing Operations, Loss Mitigation, and other Ocwen business units "frequently" and "loudly" raised this concern. In determining the root cause of various issues, she explained, **"the answer would almost always be REALServicing and the processes that we're using,** would be the answer we would get from the business . . . . [It was a] commonality across all of [the business units] . . . . Everything in servicing, every department in servicing."

52.    These senior leaders' conclusions are not outliers. Between 2014 and 2016, Ocwen assessed REALServicing and also hired an outside consultant to do the same.

14

# Exhibit A

Both Ocwen and its consultant concluded that REALServicing lacks the basic system architecture and design necessary to properly service loans.

53. Since 2014, Ocwen has also tracked its regulatory violations, risk areas, and other failures in spreadsheets named "Risk Convergence Reports." Each regulatory violation, risk item, or failure identified in the report includes a description of the issue, the date Ocwen identified the issue, whether the issue is dependent on Altisource, the status of any technology fix or other operational remediation, and other information.

54. Each item in the Risk Convergence Reports is assigned a risk rating, ranging from "R1" to "R5." "R1" is the highest risk rating, which Ocwen defines as: "Potential adverse impact of over $5 million"; "Actual or high possibility for fraud, waste or abuse"; "Breach of company policy or procedures (frequent, repeat, or disregarding policy)"; "Noncompliance with the law or regulation"; or "Material errors or irregularities are a reasonable possibility."

55. According to Ocwen's list of items in the Risk Convergence Report, the items often resulted from and have continued due to REALServicing failures or system limitations. When, for example, Ocwen conducted its first on-site audit of Altisource and REALServicing in 2014, Ocwen auditors concluded that, although 70 percent of the items contained within the Risk Convergence Report related to "technology projects and enhancements" that Altisource was responsible for, little progress was being made to resolve the items due to Altisource's "lack of priority."

56. As of August 2015, Ocwen had catalogued 2,803 issues on its Risk Convergence Report. Of those 2,803 issues, Ocwen assigned the highest risk rating, "R1," to more than 550 issues, many of which resulted from REALServicing's deficiencies.

# Exhibit A

57.    In 2016, Ocwen's Chief Information Officer and other personnel performed an architectural assessment of REALServicing, and reported, among other things, that REALServicing had "significant deficiencies represent[ing] significant risk and expense to Ocwen" and concluded that the "the most important dimensions of Core Technology" to REALServicing, such as performance and scalability, loan type support, risk exposure, and organizational capability, compare "unfavorably" to other mortgage platforms.

> 2.    *REALServicing's deficiencies impact Ocwen's ability to lawfully service loans.*

58.    REALServicing suffers from fundamental system architecture and design flaws, including a lack of properly managed data, lack of automation, and lack of capacity. These flaws have adversely impacted the accuracy of the information that Ocwen uses to service loans–and, thus, Ocwen's ability to service loans–in a number of ways.

59.    First, with respect to Ocwen's data management, REALServicing requires the use of more than 10,000 comment codes and flags. Yet, Ocwen lacks a complete data dictionary defining its comment codes, flags, and data fields. As a result, Ocwen personnel do not share a common understanding of what these comment codes or flags mean or how Ocwen personnel should use them.

60.    Ocwen employees also do not understand how changes to certain codes impact other codes or work processes. Ocwen's former Head of Compliance, who worked at Ocwen from August of 2013 until September of 2015, testified in May 2016 that during his tenure at Ocwen he repeatedly requested information on the meaning and basic descriptive information of comment codes; how Ocwen's business units used

# Exhibit A

them; and what downstream activities the codes trigger and what upstream activities trigger the codes. He further testified that "neither Ocwen nor Altisource could provide that information." Further, he testified that Ocwen's use of thousands of REALServicing comment codes was "antiquated" and that it was "inappropriate" that Ocwen did not have a data dictionary to define these codes and describe their impact on other activities.

61.     Second, REALServicing lacks the necessary automation and functionality to handle basic servicing operations. In 2015, an Ocwen consultant concluded that REALServicing had limited workflows and lacked  automation. As detailed in the next subsection and Section III, in certain areas, such as payment processing and escrow, this lack of automation has resulted in significant and excessive manual workarounds that have created errors in borrowers' accounts.

62.     Third, REALServicing has lacked the capacity to process the large number of loans that Ocwen has acquired and, in part as a result, it has not been functional for lengthy periods of time. After Ocwen's large 2013 and 2014 loan acquisitions, Ocwen's personnel reported "high incidents of system unavailability." For example, for the year of 2014, Ocwen's officials reported that its loss mitigation system "was down approximately 17,000 work hours." In internal communications in 2014, Ocwen's Head of Loss Mitigation expressed exasperation about the unavailability of Ocwen's loan modification systems:

> **I am sorry guys, this has broken my back. Enough is enough on daily issues with these systems.** We have lost more than 15 days of production of past 3 months ... I need this system up every day and performing. **It is clear by the issues over the past 3 months that there are not any controls on data and system quality.** (Emphases added.)

17

# Exhibit A

63.     Fourth, REALServicing suffers from various bugs, defects, and failures. For example, in 2014, due to programming errors and data not properly converting among REALServicing applications, Ocwen sent more than 1,800 borrowers permanent loan modification agreements that contained incorrect interest rate, principal payment, maturity date, and balloon payment information.

### C.     Ocwen has relied excessively on manual data entry and reports to address REALServicing's failures.

64.     Because of REALServicing's failures and limitations, Ocwen has resorted to manual processes, which themselves have resulted in errors. Ocwen's consultant reached the following conclusions—which Ocwen conceded were correct—after analyzing REALServicing and interviewing Ocwen business leaders:

- "[Ocwen's] lack of business process automation has resulted in **excessive manual processes to address gaps**";

- "Manual workarounds and reporting are widely used to compensate for insufficient system functionality to complete, track, or control processes"; and

- "While appearing cost effective, manual controls pose **significant risk in heightened compliance environment.**" (Emphases in original.)

65.     Ocwen creates reports–typically referred to as "control reports"–to catch errors and mistakes or data that REALServicing cannot process due to a lack of automation and other system deficiencies, but these reports are of limited use for at least two reasons.

66.     First, as Ocwen's former Head of Compliance testified, the reports are only effective to the extent that they are based on accurate and complete data. But Ocwen's former Head of Servicing Compliance, who worked for Ocwen from April of 2014 until

# Exhibit A

August 2015, testified in May 2016 that REALServicing lacks the necessary data to generate effective control reports and detect problems. She explained, for example, that when generating a control report using a certain field in REALServicing, that field is "used about five different ways" so the report generates a "whole mish-mash of information" that does not help Ocwen personnel understand whether an exception or error occurred.

67.     Second, Ocwen's manual workarounds and processes introduce the risk of human error. As Ocwen's former Head of Compliance testified, the concern that such manual processes could result in human error is "one of the sort of classic reasons one automates a manual process." Other former and current Ocwen business unit leaders have reiterated this point.

68.     For these reasons, Ocwen's controls have been ineffective. As Ocwen's former Head of Servicing Compliance testified: **"[E]very business unit in the entire organization" lacked sufficient controls to prevent mistakes and to detect when mistakes occurred.**

### D.     Ocwen's use of inaccurate and incomplete information has harmed borrowers.

69.     Ocwen's use of inaccurate and incomplete information resulting from its boarding of inaccurate and incomplete information into REALServicing, REALServicing's deficiencies, and Ocwen's error-prone manual processes has caused or is likely to have caused borrowers substantial harm, and resulted in Ocwen communicating, orally and in writing, information to borrowers that it knew or had a reason to know was inaccurate.

# Exhibit A

70.    Ocwen is aware of this substantial harm or likelihood of substantial harm. In 2015, Ocwen's outside consultant conducted interviews with Ocwen business leaders. These leaders identified 67 failures—or "pain points"—representing "functional and/or technical deficiencies" that "stemm[ed] from systematic and manual processes," including the following:

- With respect to escrow: a "technical gap causing escrow analysis to be conducted incorrectly" and a "manual bankruptcy workaround for loans acquired already in bankruptcy, causes information to be deleted from history as new information is updated. This information should be disclosed to the borrower in order to calculated escrow accurately";

- With respect to insurance disbursements: "no systematic controls exist in to prevent duplicate disbursements in REALServicing resulting in 6k -12k incidents per year. Personnel must manually remove necessary codes (e.g., paid in full, service released)";

- With respect to loan modification processes: "[u]pon review of a [loan modification] package, terms are found to be incorrect approximately 80% of the time (e.g., NPV miscalculation, final modification date incorrect)";

- With respect to foreclosure data: "[d]ata between REALResolution [the REALServicing application for foreclosures] and REALServicing is not always in sync due to lack of adequate system mapping"; and

- With respect to the payment of borrower taxes: "[a]lthough tax assessment information is supposed to be used to project more accurate payments, REALServicing automatically uses last years billing amount, even if installments for the current year are different."

20

# Exhibit A

71.     More generally, Ocwen has serviced borrowers' loans and communicated, orally and in writing, with borrowers using inaccurate and incomplete information, including information relating to borrowers' loan terms, amounts received from and owed by borrowers, escrow amounts, insurance amounts, and/or loss mitigation and foreclosure information. As set forth above and below in Section III, because Ocwen has serviced loans based on inaccurate and incomplete information, it has, among other things, collected or attempted to collect inaccurate amounts from borrowers, failed to timely pay borrowers' insurance policies, provided borrowers with loan modifications with inaccurate terms, and initiated wrongful foreclosure proceedings upon borrowers' loans.

72.     Ocwen's use of a deficient system of record that results in inaccurate and incomplete borrower loan information does not benefit consumers or competition. Such a system of record does not result in cost savings, enhanced customer service, or other benefit to consumers or competition.

## III.   OCWEN'S SERVICING FAILURES HAVE MANIFESTED THEMSELVES IN AT LEAST EIGHT DISTINCT WAYS THAT HARM BORROWERS

### A.     Ocwen has mishandled borrowers' payments.

73.     Ocwen is required to correctly credit borrowers' payments, including any overpayment or partial payments, consistent with the borrowers' mortgage notes and applicable laws, including Regulation Z.

74.     Ocwen has routinely failed to send borrowers timely and accurate periodic statements, failed to timely and accurately credit and apply borrower payments, and failed to correct billing and payment errors.

# Exhibit A

75.    Each day, Ocwen cashiering personnel manually enter, pull, and match entries in REALServicing for more than 45,000 borrower-related transactions, including 5,000 payment transactions and more than 40,000 disbursements. Ocwen internal business units requested that Ocwen automate REALServicing to process borrowers' payments and disbursements for taxes and insurance. They explained that, "due to the volume[,]" there is an "immense need to automate this reconciliation" to ensure "no risk for data loss or corruption."

76.    As Ocwen's former Head of Compliance testified, Ocwen has a higher risk profile in the mortgage servicing industry due its heavy use of manual processes in its Cashiering Unit, which handles credits to (*e.g.*, borrowers' payments) and debits from (*e.g.*, disbursements for taxes or insurances) a borrower's loan balance.

> 1.    *Ocwen's obligations under Regulation Z, Regulation X, the CFPA, and the FDCPA.*

77.    Under Regulation Z, a servicer generally must provide a borrower with a periodic statement each month that details, among other things, the amount the borrower must pay that month, how the servicer will break down and apply the borrower's monthly payment, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account. When a servicer receives a full periodic payment for a loan secured by the consumer's principal residence, it must credit the payment as of the date the payment is received unless, among other exceptions, the delay in crediting does not result in a charge to the borrower or negative reporting to a consumer reporting agency.

78.    If the servicer receives a partial payment and holds it in a suspense or unapplied funds account, Ocwen must, after accumulating funds sufficient to cover a

# Exhibit A

periodic payment, treat such funds as a full periodic payment (*e.g.*, an amount sufficient to cover principal, interest, and escrow, if applicable, for any given billing cycle).

79.     Under Regulation X, a servicer is also required to have policies and procedures reasonably designed to ensure, among other objectives, that the servicer is providing accurate and timely disclosures to a borrower as required by applicable law, such as periodic statements required under Regulation Z.

80.     In addition to the requirements under Regulation Z and Regulation X, a servicer is prohibited from engaging in unfair, deceptive, and abusive acts and practices related to payment crediting and debt collection activities under the CFPA and FDCPA.

> 2.     *Ocwen has failed to comply with Regulation Z, Regulation X, the CFPA, and the FDCPA.*

81.     Ocwen has failed to comply with Regulation Z, Regulation X, the CFPA, and/or the FDCPA in at least six ways.

82.     First, in numerous instances, Ocwen has sent borrowers periodic statements that contain inaccurate information—such as the date when Ocwen received a borrower payment or the payment amount owed by a borrower—because of inaccurate information in REALServicing. In other instances, even when the information in REALServicing has been accurate, REALServicing's deficiencies have resulted in Ocwen sending borrowers periodic statements with inaccurate information related to interest, late fees, escrow amounts, prepayment penalty statuses, payment amounts, deferred principal balance amounts, and payments that Ocwen should have credited but refused to credit and returned to borrowers. As demonstrated by Ocwen's recurring inaccuracies in its periodic statements, Ocwen has also failed to maintain reasonably designed

# Exhibit A

policies and procedures to ensure that it is providing borrowers with accurate and timely periodic statements.

83.    Second, Ocwen has failed to properly credit full periodic payments that borrowers properly made to Ocwen as of the date of receipt, wrongly resulting in late fees, negative credit reporting, and inaccurate loan delinquencies.

84.    Since at least 2014, Ocwen has known that its lockbox vendor, which handled its intake of physical payments (*e.g.*, checks) until 2016, was unable to accurately record the date when Ocwen received a borrower's physical payment. As Ocwen detailed in its Risk Convergence Reports, this failure has resulted in "delayed payment posting, incorrect payment effective dating, late fees assessment, and negative credit reporting."

85.    Ocwen has identified numerous other payment processing errors by its personnel and lockbox vendor, including:

- Inconsistent processing of multiple payments (2 or more checks in one envelope) that "cause misapplication of physical payments by applying as an individual payment instead of combined multi-payment";

- Ocwen's lockbox vendor's failure to image correspondence received with payments, resulting in payments not being correctly identified "until a borrower claim is received. Ultimately, this results in delays in payment posting process, late fee assessment, and negative credit reporting;" and

- Where borrower payments by wire are manually entered and converted by Ocwen personnel into REALServicing: "[s]ometimes the file conversion does not convert the data properly and the data needs to be reviewed, corrected and uploaded to

# Exhibit A

REALServicing by Cashiering" and "[e]rrors can occur during this manual process."

86.     Even after switching lockbox vendors in 2016, Ocwen continued to identify payment processing mistakes. For example, in January of 2016, Ocwen found that "$8,420,208 in payments were received but not posted to customer's accounts." Ocwen concluded: "Management has identified that not applying received payments or loading payments multiple times has become a common occurrence."

87.     Third, Ocwen has failed to timely credit payments from borrowers' suspense accounts when the suspense amount has accumulated sufficient funds to cover a full periodic payment. Ocwen has allowed borrowers' payments to languish in suspense accounts for several days, months, and even years. As a result of Ocwen's failure to timely credit payments in suspense accounts, in certain instances, Ocwen has charged borrowers late fees and deemed borrowers to be delinquent.

88.     For example, a September 15, 2015 audit by investors of loans Ocwen serviced found that: "unapplied/suspense funds were not properly maintained," and that, as of June 2015, more than 4,000 of the investor's loans had suspense amounts "aged over 90 days up to 1,236 days" that totaled more than $2.6 million with amounts ranging to $0.01 to more than $27,000. The auditors also found that for the miscellaneous suspense account there were more than 2,000 investor loans "with amounts over 90 days and up to 680 days and that totaled over $1.9 million with amounts [in the suspense account] ranging from $0.01 to $267,475.64."

89.     Fourth, Ocwen has misapplied borrowers' payments and miscalculated borrowers' loan balances and amounts due. Once Ocwen receives a payment from a borrower, the mortgage contract specifies how Ocwen must credit the payment (*e.g.*, to

25

# Exhibit A

principal and interest first, then to any late and default fees). Ocwen has identified

numerous instances where it has misapplied borrowers' payments and miscalculated

borrowers' loan balances and amounts due. For example, in May 2016 Ocwen

determined that, due to a failed attempt in 2014 to fix a REALServicing technology flaw,

it was charging incorrect amounts to borrowers and was "not being compliant with the

terms dictated in the note" which "directly impact  the monthly account statement sent

to the borrowers."

90.    Fifth, for borrowers in bankruptcy, Ocwen has failed to process and apply

payments correctly in accordance with certain bankruptcy requirements. By 2016,

Ocwen had concluded that REALServicing was broken in a number of ways that

adversely affected borrowers whose loans were subject to bankruptcy protections,

including that:

- "When REALServicing makes a contractual payment using pre- or post-petition
  funds, the payment covers only the principal and interest component. Escrow is
  not paid. This is contrary to what a bankruptcy court expects. Payments should
  only be made for the full contractual amount, including the escrow (as calculated
  for the due date of the payment to be made);"

- "There is no connection between the proof of claim as determined in
  Equator/REALResolution [the system Ocwen uses to process bankruptcy] and
  the pre-petition arrearage balances in REALServicing. The proof of claim figures
  need to become the REALServicing arrearage balances."

- "The process of converting a bankruptcy trustee payment to a payment batch is
  highly manual and, therefore, both inefficient and at risk of error. Ocwen receives
  funds from bankruptcy trustees that, generally, need to be applied to borrower

Exhibit A

accounts as either pre-petition payments, post-petition payments, or bankruptcy

interests. There are some cases where, due to loan status, funds from the trustee

are not applied as payment, but are applied to miscellaneous suspense or other

non-payment accounts. Ocwen receives funds from bankruptcy trustees in a

single check that usually covers multiple accounts. Ocwen needs to apply the

funds across the different loans."

91.    Sixth, based on Ocwen's above failures, Ocwen has communicated, orally

and in writing, inaccurate information to borrowers about amounts due from borrowers,

amounts received from borrowers, dates as to when Ocwen received borrowers'

payments, and borrower delinquency statuses. These representations are material to

borrowers managing their mortgages and are likely to mislead borrowers acting

reasonably under the circumstances.

> 3.    *Ocwen's payment processing failures have caused significant*
> *borrower harm.*

92.    Ocwen's errors in crediting borrower payments and use of inaccurate

payment information have significantly harmed borrowers. Ocwen has charged

borrowers improper late fees; reported inaccurate, negative payment information to

credit reporting agencies; subjected borrowers to collection calls based on inaccurate

information; and wrongly threatened borrowers with foreclosure. This conduct has

harmed borrowers financially and caused borrower frustration and emotional distress.

93.    Even when Ocwen has identified a payment error, in many instances it has

not properly corrected the error. Pursuant to Ocwen's policies and procedures, its

Cashiering Department corrects identified errors through a "reversal request" or

# Exhibit A

correction to a borrower's account. In many instances, however, Ocwen's personnel have not made the reversal request in a timely or accurate manner.

94.     A March 30, 2016 internal audit found, for example, that Ocwen's Cashiering Department lacked controls to ensure that reversal requests–approximately 3,700 a month at that time—were timely and accurately processed. The auditors also found that, when Ocwen actually processed reversal requests, it processed requests in the sample incorrectly.

95.     Not surprisingly, given Ocwen's significant problems crediting and applying borrower payments, a large number of borrowers have complained about Ocwen's payment processing.

96.     From April 2015 to April 2016 alone, Ocwen received complaints from more than 68,000 borrowers related to its processing of payments. Ocwen determined it made numerous errors in the following categories: "Payments Not Applied Correctly"; "Funds Not Applied Correctly";  "Reversal Requests"; "Late and NSF Fees"; "Payment Missing –Not Applied to Account"; "Chargeback Issue - Borrower Disputes Charged Back Item"; "Fee Assessed Improperly"; "Payment Not Processed Timely"; "ACH Drafted Incorrectly (Incorrect Date, Multiple Drafts, etc.)"; "Payoff Overage"; "ACH Payment – Chargeback"; and "Incorrect Data in the Account Statement."

97.     The experience of one consumer trying to prepay her mortgage in April 2016 is illustrative of Ocwen's payment processing errors. According to the consumer, she sent Ocwen two checks—one for principal and interest, and one check for her escrow payment—on or around April 2, 2016 to prepay her May 2016 mortgage payment. Even though the borrower stated that she sent the checks in the same envelope, Ocwen records indicate that it received and processed the payments on different days. In

# Exhibit A

addition, when the borrower received her May 2016 mortgage statement, she reports
that Ocwen had misapplied her April 2016 principal and interest payment into a
suspense account. As a result, even though the borrower had sent Ocwen funds in
advance to *prepay* her mortgage, the consumer reports that Ocwen changed her status
to delinquent in May 2016, charged her late fees, and made disruptive and embarrassing
collection calls to her at her home and work.

98.    Another borrower complained that Ocwen began rejecting her monthly
payments in November of 2014, even though she had been making full payments
pursuant to a September 2014 loan modification. The borrower states that when she
contacted Ocwen, an Ocwen case manager told her that Ocwen's systems had rejected
the payment because the modified payment amount that Ocwen had recorded in its
system was a few cents different than the modified monthly payment amount that
Ocwen had told the borrower to pay in a letter approving her loan modification. After
supposedly fixing this issue, the borrower reports that Ocwen then began misapplying
her payments to the previous month (*e.g.*, claiming the borrower made her January
2015 payment in February 2015). As a result, the borrower began receiving delinquency
notices and eventually a notice of default from Ocwen indicating that she had a past due
balance of $2,446.66. The borrower reports that she made repeated attempts to get
Ocwen to correct its mistakes, but as of October 2016, Ocwen had still not fixed them.
According to the borrower, this ordeal has caused her a significant amount of stress and
embarrassment: "It is very embarrassing to come home and see a notice on my door of
an impending foreclosure especially when I have made and continue to make my
mortgage payments to Ocwen."

# Exhibit A

99.    Another borrower complained that Ocwen sent him an inaccurate payoff
quote that caused the borrower's pending property sale to fall through. In a March 31,
2016 letter, Ocwen sent the borrower a payoff statement with a payoff balance of
$88,325.49. A few months later, on September 8, 2016 Ocwen sent the borrower
another payoff statement that listed a payoff balance of $139,149.61—$50,000 more
than the payoff quote Ocwen provided just a few months earlier. According to the
borrower, he contacted Ocwen at least 15 times to dispute the payoff amount, but was
not able to get Ocwen to address the matter until he submitted a complaint to the
Bureau and the Texas Attorney General. In a letter dated September 28, 2016, Ocwen
admitted that "the figures on the payoff statement sent on September 8, 2016 were
incorrect." In the letter, Ocwen stated that it had generated a new payoff statement with
a corrected payoff amount of $84,569.90—more than $55,000 less than the payoff
quote Ocwen provided to the borrower a few weeks earlier. Ocwen did not explain,
though, how the error had occurred in the first place. According to the borrower, due to
the payoff discrepancy, he had to delay the pending sale of the property and the sale fell
through. He had to find another buyer for his property, which he later did.

## B.    Ocwen has botched borrowers' escrow accounts.

100.    Ocwen has also failed to perform basic tasks associated with managing
borrowers' escrow accounts. Specifically, due to systems failures, control lapses, and
excessive reliance on manual processes, Ocwen has failed to conduct escrow analyses or
accurate escrow analyses; failed to timely send borrowers accurate escrow statements;
and failed to properly account for and apply borrower escrow shortage payments.

101.    As of April 2016, Ocwen managed escrow accounts for more than 78
percent of the loans it services. In 2014, Ocwen hired consultants to review and report

30

# Exhibit A

upon its escrow practices. The resulting report identified more than **three million**

"documented CFPB violations" during 2014, including Ocwen's failure to: provide

escrow statements or accurate escrow statements to borrowers; conduct escrow analyses

or accurate escrow analyses; and accurately impose hazard and flood insurance.

        1.    *Ocwen's obligations under RESPA, the CFPA, and the FDCPA.*

    102.    RESPA and Regulation X generally require servicers to do the following for

escrow accounts that they establish in connection with a federally related mortgage

loan: (1) perform an annual escrow analysis to determine the monthly escrow account

payments for the next computation year; (2) provide an annual statement reflecting the

activity in the escrow account during the escrow account computation year and a

projection of the activity in the account for the next year; (3) refund to the borrower any

surplus disclosed in an escrow analysis or, if the surplus is less than $50, alternatively

credit such surplus against future escrow payments; and (4) potentially seek repayment

for any shortage (*i.e.*, the amount by which a current escrow account balance falls short

of the target balance at the time of an escrow analysis) disclosed in an escrow analysis.

    103.    Under Regulation X, a servicer is also required to have policies and

procedures reasonably designed to ensure, among other objectives, that the servicer is

providing accurate and timely disclosures to a borrower as required by applicable law,

such as escrow statements required under Regulation X.

    104.    In addition, the CFPA and FDCPA prohibit servicers from engaging in

unfair, deceptive, and abusive acts and practices related to escrow and debt collection

activities.

# Exhibit A

> 2.   *Ocwen has failed to comply with RESPA, the CFPA, and the FDCPA.*

105.   Ocwen has failed to comply with RESPA, the CFPA, and/or the FDCPA in at least five ways.

106.   First, as of mid-2014, Ocwen had failed to conduct annual escrow analyses within the required time period for up to 230,000 delinquent borrowers and up to 60,000 borrowers who had filed for bankruptcy, in violation of Regulation X.

107.   According to the Head of Ocwen's Escrow Department, until at least July or August of 2014, Ocwen did not conduct these annual analyses for borrowers in delinquency.

108.   Ocwen's failure to conduct escrow analyses for borrowers in delinquency also impacted the accuracy of its borrowers' payoff and reinstatement quotes. Because REALServicing's calculation of delinquent borrowers' payoff and reinstatement quotes— the amount they need to pay to respectively payoff or reinstate their loan to become current—depends in part on borrowers' escrow balances, REALServicing miscalculated the payoff and reinstatement quotes for many of the loans for which Ocwen did not conduct an escrow analysis. Ocwen's failure to conduct escrow analyses resulted in Ocwen providing up to 5,000 delinquent borrowers with inaccurate reinstatement quotes.

109.   In some instances, Ocwen failed to perform or timely perform escrow analyses during the pendency of a Chapter 13 bankruptcy. Further, Ocwen failed to service its loans in accordance with bankruptcy protections and has attempted to collect purported escrow shortages or arrears in violation of bankruptcy orders and rules.

# Exhibit A

110.    In June 2016, Ocwen's Head of Bankruptcy testified that more than 22,000 borrowers in bankruptcy were impacted by Ocwen's failure to conduct a timely escrow analysis and that Ocwen is currently attempting to remediate these borrowers. Ocwen's consumer complaint data indicates that, for the year of April 2015 to April 2016, at least 8,000 of these 22,000 impacted borrowers complained to Ocwen.

111.    In many instances, even when Ocwen has performed escrow analyses on borrowers' accounts, Ocwen has either: (1) failed to send escrow statements to borrowers because of REALServicing system deficiencies; or (2) sent inaccurate escrow statements. Consequently, Ocwen has failed to maintain reasonably designed policies and procedures to ensure that borrowers receive timely and accurate escrow statements.

112.    As a result, in mid-2014, Ocwen performed escrow analyses for an estimated 10,000 to 20,000 borrowers but then failed to generate or timely send the required escrow statements to these borrowers within the required year.

113.    When Ocwen has sent escrow statements, in many instances, the escrow statements have contained inaccurate information pertaining to the borrowers' account histories, escrow balances, and escrow payments. In September of 2014, Ocwen's then Head of Servicing Compliance acknowledged this failure in internal e-mails:

> **Escrow notices not compliant with RESPA, not sent timely or not sent at all are huge and are the foundation for all else.** These are, by the way, the three biggest borrower communication issues across the board for Ocwen - required content not included, letter not sent, or letter not sent timely. **This is estimated to impact 800,000 borrowers or 52% of the Ocwen customer base.** (Emphases added.)

114.    Third, Ocwen has failed to timely process escrow shortage payments—*i.e.*, payments that borrowers made at Ocwen's request to satisfy a shortage or deficiency in

# Exhibit A

their escrow accounts—that Ocwen needed to pay the borrowers' insurance or tax disbursements, in violation of Regulation X.

115.    Since 2014, Ocwen's personnel has manually entered a comment code in REALServicing when the borrower has paid an escrow shortage. As Ocwen's auditors found in a March 30, 2016 audit, however, Ocwen did not have adequate controls over the entry of these comment codes and therefore Ocwen did not catch when its personnel failed to manually enter appropriate comment codes relating to escrow shortages. As Ocwen's auditors found, this resulted in "the continued collection of escrow shortage amounts" that borrowers already paid. Specifically, Ocwen failed to timely process escrow shortage payments for what Ocwen estimates to be 5,000 to 10,000 borrowers.

116.    Fourth, in many instances, Ocwen has miscalculated borrowers' escrow amounts or mistakenly imposed escrow requirements, resulting in Ocwen charging, collecting, or attempting to collect, through communications to borrowers, incorrect escrow amounts.

117.    Ocwen has miscalculated borrowers' escrow amounts by mistakenly paying borrowers' insurance premium charges twice; disbursing borrowers' insurance premiums to the wrong insurance companies; creating escrow accounts even though borrowers were already paying their insurance premiums or taxes directly to their insurance companies or taxing authorities; and failing to account for escrow amounts or accurate escrow amounts in borrowers' loan modification payment amounts (*e.g.*, borrowers' modified monthly mortgage payments), which borrowers learn of only after accepting the new modified amount.

# Exhibit A

118.   In the bankruptcy context, Ocwen has also failed to generate accurate

escrow amounts. In late 2014, the Head of Ocwen's Escrow Department wrote in an

email, which was forwarded to Ocwen's Chief Executive Officer:

> **I've stressed importance of getting the BK escrow
> balance issues fixed, but no confirmation of root
> cause or target correction date** . . . . It's a system issue
> because a bucket that determines the amount of money that
> a customer sends for their monthly payment can change with
> no record of why on the system . . . . **Please help get the
> importance across on this issue.** If this is not fixed, I
> cannot recommend that we move to analyze BK for the
> portfolio. Even with a control report to catch them, there is
> still risk the balance will be wrong when you actually analyze
> the account. (Emphases added.)

119.   In late 2014, Ocwen's then Head of Servicing also emailed Ocwen's Chief

Executive Officer and asked for additional consulting resources to handle Ocwen's

escrow deficiencies because, as Ocwen's Head of Servicing Operations reported: "you

are familiar with this issue - the BK escrow balance bucket is wrong and requires every

BK loan to be manually reviewed and we can still have errors."

120.   Fifth, as a result of Ocwen's above failures, Ocwen has communicated,

orally and in writing, inaccurate information to borrowers about escrow amounts,

reinstatement amounts, and payoff amounts. These representations are material to

borrowers managing their mortgages and are likely to mislead borrowers acting

reasonably under the circumstances.

> 3.   *Ocwen's escrow failures have caused significant borrower harm.*

121.   Ocwen's escrow errors have caused significant harm to borrowers,

including the costs and emotional distress that borrowers suffer when attempting to get

Ocwen to correct its mistakes.

# Exhibit A

122.    This type of harm can disproportionately affect borrowers in bankruptcy.

As Ocwen's former Head of Servicing Compliance testified:

> If you have a borrower who is sixty days down or in BK
> [bankruptcy], if an analysis is done and they find that the
> escrow account is short and the payment has to go up by fifty
> bucks.....If you've got somebody that's sixty days down or in
> BK [bankruptcy] and all of a sudden, because of a shortage in
> the escrow account, their payment goes up by fifty bucks,
> that can make a big difference. So it can have a
> disproportionate impact because they're already on the ropes
> financially.

123.    From April 2015 to April 2016, Ocwen received more than 53,000

complaints relating to its handling of escrow accounts. Ocwen determined it made

numerous errors in the following categories: "Escrow Analysis Needed, Last Analysis

Incorrect"; "Escrow Payment Change Inquiry"; "Escrow Info Incorrect or Not Set Up";

"Escrow Analysis Needed"; "Escrow Overage Not Received"; "Escrow Payment Change

Dispute"; "Escrow Analysis Needed due to Payment"; "Negative Escrow Balance";

"Escrow Analysis Requested due to Refund"; and "Taxes Escrowed- Paid on Wrong

Parcel."

124.    One borrower contacted Ocwen multiple times to complain about an

incorrect, inflated escrow deficiency. The borrower had previously filed for bankruptcy,

and by a bankruptcy court order on June 1, 2015, his account was deemed current with

an escrow deficiency of $530.67. Despite the court order, Ocwen continued to report an

escrow deficiency of $8,468.03. The borrower complained repeatedly to Ocwen, but to

no avail. In March 2016, the borrower filed a complaint against Ocwen with the Bureau

and the Texas Attorney General. In a response letter dated June 3, 2016, Ocwen

acknowledged that, per the June 1, 2015 court order, the borrower's account should

have been deemed current with an escrow shortage of only $530.67. Ocwen also

# Exhibit A

admitted that it had sent the borrower two escrow statements that reflected an

"incorrect escrow account balance deficiency" and apologized for any "frustrations [the

borrower had] incurred as a result of the error." Ocwen agreed to make corrections to

the borrower's account, run a new escrow analysis, waive all fees and expenses that

Ocwen had charged to the account, and amend any negatively reported credit

information.

125.    The complaint submitted by another borrower typifies the myriad of

payment processing, escrow, and insurance errors Ocwen makes, and how they can

drive borrowers into foreclosure. The borrower complained about the following series of

errors:

- When the borrower entered into a loan modification in April of 2016, his

  principal balance increased by more than $161,000, but Ocwen was unable to

  explain why his balance increased by this amount;

- Even though the borrower made his required monthly modification payments on

  time, Ocwen repeatedly failed to post his payments on time or at all;

- Ocwen charged the borrower for flood insurance that the borrower did not need

  because his property was not in flood zone; and

- Ocwen then erroneously attempted to foreclose on the borrower.

126.    In a letter dated February 10, 2017, Ocwen admitted to multiple errors in

the process:

- Ocwen explained that the increase in the borrower's principal balance when his

  loan was modified was because the borrower had a negative escrow balance of

  $88,124.55 and $124,912.71 had been capitalized during modification. But Ocwen

  did not explain why the borrower's principal balance had increased to $161,000.

# Exhibit A

- Ocwen admitted, though, that the negative escrow balance was wrong and based on erroneous charges it imposed on the borrower for lender-placed flood and hazard insurance: "When the modification was completed the calculations used Lenders Placed Flood Insurance and Lenders Placed Hazard Insurance for multiple years that were not necessarily due."

- As a result of these erroneous charges, Ocwen determined that the borrower actually had a positive escrow balance or *surplus* of $36,788.16 in his escrow account, not an negative escrow balance or deficiency of more than $88,000.

127.   In light of these errors, Ocwen stated that it would be "re-modifying the loans current terms accordingly" and would attempt to waive the foreclosure fees it had imposed on the borrowers' account. On March 24, 2017, the foreclosure proceedings against the borrower were voluntarily dismissed.

128.   This borrower's experience also illustrates the types of harm that Ocwen's errors impose on borrowers. The borrower described the ordeal as follows:

> I spent one full day a week for the last three and a half years dealing with Ocwen, this includes calling the company mainly waiting on the phone on hold and talking to individuals at their call center . . . and faxing and emailing. Recently I have spent a large amount of time and money dealing with the foreclosure proceedings. The costs and time included attorney fees and paying for my own counsel, which cost between $6,000 and $8,000, to respond to the Notice of Foreclosure, amongst other costs.

**C.   Ocwen has mishandled borrowers' hazard insurance.**

129.   Ocwen has failed to make timely payments of borrowers' hazard insurance premiums and serviced loans based on inaccurate insurance data that has led to wrongful insurance premium charges.

# Exhibit A

        1.     *Ocwen's obligations under RESPA, the CFPA, and FDCPA.*

130.    Under RESPA and Regulation X, if a borrower's monthly payment includes a payment for hazard insurance, such as homeowner's insurance, wind insurance, or other types of property-related insurance, then the servicer must generally make disbursements in a timely manner, on or before the deadline to avoid a penalty, as long as the borrower's payment is not more than 30 days overdue.

131.    In addition, the CFPA and FDCPA prohibit servicers from engaging in unfair, deceptive, and abusive acts and practices related to debt collection activities and in connection with mortgage servicing, including in the context of charges its imposes relating to borrowers' insurance policies, such as flood insurance policies.

        2.     *Ocwen has failed to comply with its RESPA, CFPA, and FDCPA obligations.*

132.    Ocwen has failed to comply with RESPA, the CFPA, and FDCPA in at least three ways.

133.    First, in numerous instances since September 2014, Ocwen has failed to properly disburse borrowers' payments to their hazard insurance companies. Due to syncing and updating failures between REALServicing and Ocwen's insurance vendor's system, Ocwen's insurance vendor did not recognize that numerous Ocwen borrowers had escrow accounts and therefore failed to make disbursements to these borrowers' insurance companies. In other instances, incorrect account data in REALServicing has resulted in Ocwen making incorrect disbursements for borrowers' insurance policies. Ocwen, for example, made double payments (out of borrowers' accounts) for the same insurance policy on approximately 3,275 accounts, disbursed premiums to wrong

# Exhibit A

payees, and failed to timely disburse funds to pay approximately 40,000 insurance premiums.

134.    Ocwen's failures have resulted in the lapse of hazard insurance coverage for more than 10,000 borrowers. As of March 2015, more than:

- 1,500 of these borrowers were able to reinstate their insurance policy, but had to pay a higher premium;

- 3,000 of these borrowers received letters from Ocwen indicating that it was going to impose force-placed insurance on their loans because they lacked hazard insurance;

- 500 of these borrowers had force-placed insurance imposed on their loans by Ocwen; and

- 100 of these borrowers were foreclosed upon by Ocwen.

135.    For borrowers who were forced to pay a more expensive premium to reinstate or obtain new hazard insurance coverage, Ocwen's insurance vendor ultimately agreed to provide a credit to the borrower to cover the increase in premium for at least three years.

136.    Second, Ocwen's use of inaccurate insurance data to service borrowers' loans has led it to charge borrowers for insurance premiums for insurance policies that borrowers were not required to maintain. For example, Ocwen has repeatedly used inaccurate flood insurance data to service its loans.

137.    In early 2014, a large bank servicer who transferred the subservicing rights of its loans to Ocwen audited a sample of  loans where Ocwen had force-placed flood insurance policies on borrowers' properties. For approximately half of the loans it tested, the large bank servicer found that Ocwen had imposed force-placed flood

40

# Exhibit A

insurance on borrowers' homes, despite the fact that the large bank's records indicated

that the borrowers already had their own flood insurance policies in place.

     138.   In late 2014, when Ocwen reviewed its escrow processes, it also found that

it had "[i]nconsistent and/or incomplete flood determination data loaded for all loans

on REALServicing" and that "[a]ccurate flood determination data is required to ensure

appropriate tracking of flood insurance."

     139.   In early 2015, when Ocwen audited flood zone data among its various

service providers, it found more than 3,000 loans for which the flood-zone-related data

in REALServicing was inaccurate. In July of 2015, Ocwen's auditors also concluded that

Ocwen "lacks sufficient controls to ensure lender-placed flood insurance policies do not

exceed regulatory required coverage amounts." Ocwen's auditors also reviewed a sample

of 40 loans where the property was located in a flood zone and noted: "there were

several loans where the lender-placed flood insurance policy amounts exceeded the

required statutory or investor minimum coverage. Further, there were instances where

gap insurance policies were created, even though the customer independently purchased

sufficient flood coverage."

     140.   Third, based on Ocwen's above insurance-related failures, Ocwen has

communicated, orally and in writing, inaccurate information to borrowers about the

amount or whether insurance premium charges are due from borrowers. These

representations are material to borrowers managing their mortgages and are likely to

mislead borrowers acting reasonably under the circumstances.

# Exhibit A

3.    *Ocwen's insurance failures have caused significant borrower harm.*

141.    Ocwen's insurance failures have caused substantial financial and emotional harm to borrowers. From April 2015 to April 2016, Ocwen received complaints from more than 19,000 borrowers related to its management of borrowers' insurance policies. Ocwen found that it had made numerous errors relating to force-placed insurance imposed on borrowers' accounts, borrowers' hazard insurance not being paid, and insurance refunds not being timely refunded or paid to borrowers.

142.    For example, one borrower complained to Ocwen that it had erroneously force-placed flood insurance on his property. According to the borrower, he had to take out a loan to pay the more than $4,300 cost of the flood insurance policy. In a May 3, 2016 letter, Ocwen admitted that "[i]n review of the account, [the force-placed flood insurance policy] was due to an incorrect loan number provided by the insurance company."

143.    Another borrower's experience highlights the difficulty borrowers have had in getting Ocwen to correct its insurance errors, as well as the downstream effects these errors can have on borrowers' escrow accounts and payments amounts. This borrower complained to Ocwen multiple times about her escrow payments, but was not able to resolve her complaints until she submitted a complaint through her state regulator. In a May 8, 2015 letter responding to the borrower and the state regulator, Ocwen admitted that it had made a "duplicative disbursement for windstorm hazard insurance," resulting in the borrower being overcharged for insurance. In addition, Ocwen conceded that the duplicate wind insurance payment had caused her escrow

# Exhibit A

balance to appear artificially low, which resulted in Ocwen incorrectly increasing the borrower's monthly payment to account for the purported shortage.

**D.    Ocwen has mishandled borrowers' private mortgage insurance.**

144.    Ocwen has also failed to timely cancel borrower's private mortgage insurance ("PMI"). Borrowers are generally required to purchase PMI when they obtain a mortgage but have a down payment of less than 20 percent, or when they refinance their mortgage but have less than 20 percent equity in their property.

145.    Under HPA, servicers are required to automatically terminate a borrower's requirement to pay PMI on the "termination date," the date when the principal balance of the mortgage is first scheduled to reach 78 percent of the original value of the property or, if the borrower is not current as of the termination date, the first day of the first month beginning after the date that the borrower becomes current on the loan.

146.    Since 2014, Ocwen has failed to comply with the HPA by failing to timely terminate borrowers' PMI after learning that the termination data contained in REALServicing was often unreliable or missing altogether. Ocwen ultimately overcharged borrowers approximately $1.2 million for PMI premiums, which Ocwen later refunded to borrowers.

**E.    Ocwen has unlawfully marketed and processed payments for add-on products.**

147.    Since at least 2011, Ocwen has been directly and materially involved in marketing and processing payments from consumers for at least 109 add-on products. These products include identity theft protection products, credit monitoring, and other financial advisory products or services.

# Exhibit A

      1.    *Ocwen's role in marketing and processing payments for add-on products.*

148.    Until it stopped marketing add-on products in 2013, Ocwen marketed add-on products to the borrowers whose loans it serviced. Among other things, Ocwen: assisted in the development of add-on product solicitations; reviewed and approved each add-on product solicitation; and identified the borrowers whom Ocwen and its add-on product vendor would target for a particular marketing campaign.

      2.    *Ocwen has failed to comply with the CFPA by enrolling borrowers into add-on products through misleading solicitations.*

149.    Ocwen has sent borrowers misleading solicitations to enroll them into add-on products.

150.    One solicitation was in the form of a voucher for $40 worth of gasoline. This solicitation did not clearly or conspicuously disclose that to actually redeem the voucher, the borrower had to enroll in the add-on product and remain in it for at least one year, during which time the borrower would be obligated to pay a monthly fee of $14.95 per month. The solicitation also did not clearly or conspicuously disclose that the borrower would receive the $40 in four separate $10 vouchers provided quarterly. This information was listed in small print on the second page of the solicitation, and not on the face of the enrollment voucher that the borrower signs and submits.

151.    Ocwen also sent a solicitation that appeared to be a check from Ocwen made out to the borrower. This check solicitation came in a "fold and tear" envelope and included a prominent Ocwen logo in the return address section of the envelope. The face of the check included a date, a check number, a routing number, and was made payable to the borrower. The solicitation only disclosed in small print directly above the check

# Exhibit A

amount, and in small print on the back of the check, that, by cashing the check, the borrower was agreeing to enroll in an add-on product.

152.    Ocwen has also enrolled borrowers into add-on products without proof of their affirmative consent. Ocwen did not require its add-on product vendors to provide proof that a borrower agreed to enroll in the add-on product before Ocwen began billing and collecting payments from the borrower for the add-on product. As a result, unless Ocwen specifically requested a copy of the call recording or other proof of enrollment, Ocwen did not know whether the borrower actually agreed to enroll in the add-on product. And if a borrower complained that he or she did not agree to enroll in the add-on product, Ocwen has stated that: "Sometimes by not responding to [an add-on product] vendor, the vendor assumes you accepted the coverage."

153.    In addition to its role in marketing and enrolling borrowers into add-on products through misleading solicitations, Ocwen processed payments, including billing and collecting payments, from these borrowers for these products.

> 3.    *Ocwen's solicitation, enrollment, and payment processing practices for add-on products have caused significant borrower harm.*

154.    Ocwen's role in marketing and processing payments from borrowers for add-on products has resulted in significant financial harm to borrowers. In many instances, borrowers paid for add-on products that they were misled into enrolling in.

155.    Ocwen's borrower complaint records reveal that numerous borrowers contacted Ocwen to complain that they never agreed to enroll in the add-on products. Borrowers also complained that, after questioning Ocwen about the add-on charges, they learned that Ocwen enrolled borrowers into such products after the borrowers

# Exhibit A

cashed vouchers or checks, even though borrowers were unaware that cashing such

vouchers or checks would result in their enrollment in the add-on products.

**F.    Ocwen has failed to properly identify and communicate with successors in interest.**

156.    Between January 2014 and mid-2015, Ocwen failed to implement policies

and procedures that were reasonably designed to meet the objective of Ocwen properly

handling accounts for successors in interest to a deceased borrower ("successors"),

particularly when successors were applying for loss mitigation assistance. As a result,

Ocwen failed to properly recognize individuals as successors, denied loss mitigation

assistance to, and, in some instances, ultimately conducted foreclosure sales upon the

loans of successors who may have been eligible for a loan modification or other loss

mitigation options.

1.    *Ocwen's obligations under Regulation X.*

157.    Under Regulation X, servicers are required to have policies and

procedures that are reasonably designed to ensure upon notification of the death of a

borrower the servicer can promptly identify and facilitate communication with a

successor with respect to the property secured by the deceased borrower's mortgage

loan.

158.    When a borrower passes away, a successor to the borrower's property

interest may seek to communicate with a servicer about the deceased borrower's

mortgage loan. A successor may want information about the status of the mortgage loan

obligation prior to assuming the mortgage. A successor may also apply for loss

mitigation assistance prior to assuming the mortgage in order to determine whether the

mortgage loan obligation is affordable for the successor.

# Exhibit A

> 2.    *Ocwen has failed to comply with its obligations under Regulation X.*

159.    Between January 2014 and mid-2015, appropriate Ocwen business units did not have policies and procedures to ensure that Ocwen handled successors in interest as required under Regulation X. As a result, when potential successors called Ocwen, its call center personnel did not provide clear and complete information and generally only requested death certificates, a last will and testament, and/or a probate order from potential successors, even though Ocwen has required additional documentation, such as a letter of testamentary or a letter of administration, to establish that an individual's status as a successor.

160.    Ocwen has also lacked reasonably-designed policies and procedures to ensure that it promptly identified and facilitated communications with a successor about the appropriate steps and information required for a successor to assume a mortgage and obtain a loan modification. Prior to mid-2015, certain Ocwen business units, such as Loss Mitigation, had no policies and procedures relating to successors. Other business units did have policies and procedures, but they were deficient. As a result, when successors have contacted Ocwen to apply for loss mitigation assistance, Ocwen personnel have provided them with incomplete or inaccurate information about Ocwen's specific requirements regarding the loss mitigation application and assumption process.

> 3.    *Ocwen's failure to comply with its Regulation X obligations has caused significant harm to successors.*

161.    Ocwen's failure to maintain reasonably-designed policies and procedures has made it more difficult for, and in many instances actually prevented, successors from obtaining necessary information about the status of a deceased borrower's

# Exhibit A

mortgage and potential loss mitigation options. Ocwen has estimated that, when it incorrectly denied loan modifications on the ground that there was no successor when Ocwen's own records indicated that there was a successor, it has "harmed" at least 202 borrowers and that there was "probable harm" to 195 borrowers. As of January 2016, Ocwen had also initiated foreclosure proceedings on at least 314 of the loans that it identified as potentially being impacted by its failures.

162.    For example, one potential successor complained that Ocwen had provided her with misinformation about the requirements for receiving a loan modification for her deceased mother-in-law's property. According to the potential successor, when she contacted Ocwen to inform it that her mother-in-law had passed away and that she and her husband wanted to request loss mitigation assistance to keep the property, Ocwen told her that she and her husband would not need to assume the mortgage. According to the potential successor, Ocwen later informed her—after she had made all required payments under a trial modification—that if she wanted to receive a permanent modification, she and her husband would have to assume the mortgage. The potential successor also complained that Ocwen had wrongfully charged foreclosure fees to the account, even though Ocwen records showed it had placed a foreclosure hold on the account. The potential successor complained to Ocwen, which directed the potential successor to its foreclosure firm, to explain the foreclosure fees. When the potential successor contacted Ocwen's foreclosure firm about the foreclosure fees, however, she reports that the firm told her that it had not done any work because the foreclosure was on hold.

# Exhibit A

### G.  **Ocwen has failed to protect borrowers when it has made servicing errors.**

163.    Ocwen's errors at every loan servicing stage have made it even more important that the company adequately investigate and respond to borrower complaints and notices of errors. These functions can act as a "safety net" to catch borrowers before they are further harmed by a servicer's unlawful conduct. Here, too, Ocwen has failed borrowers. Since April 2015, Ocwen has received more than 580,000 complaints and written notices of error from more than 300,000 different borrowers.

164.    Since 2014, Ocwen has routinely failed to reasonably investigate, and, when appropriate, make corrections in response to borrower complaints and notices of errors. These failures have caused serious harm to consumers.

        1.    *Ocwen's obligations under Regulation X.*

165.    Under Regulation X, servicers are required to have policies and procedures that are reasonably designed to ensure that Ocwen investigates, responds to, and, as appropriate, makes corrections in response to complaints by borrowers. Written borrower notices that are sent to an Ocwen-designated address and allege certain types of errors are considered a qualified written request and notice of error (collectively "NOE") and entitle borrowers to additional protections under RESPA and Regulation X. For both complaints and written NOEs, servicers generally are required to conduct a reasonable investigation of the alleged error and, as appropriate, make corrections.

        2.    *Ocwen has failed to comply with its obligations under Regulation X.*

166.    Ocwen has failed to comply with the requirements of Regulation X in at least two ways.

# Exhibit A

167.    First, Ocwen has failed to implement policies and procedures that are reasonably designed to meet the consumer complaint handling objectives to respond, investigate, and, where appropriate, correct errors.

168.    Per Ocwen's policy, Ocwen call center personnel are supposed to escalate repeat complaints regarding the same issue to a supervisor or a designated call center employee, known as the borrower's "Escalation Relationship Manager." But, due to insufficient policies and procedures and an overreliance on rigid scripting, Ocwen call center personnel have failed to adequately resolve the complaint or escalate the call for investigation and correction of the error. As a result, borrowers have been forced to call Ocwen multiple times about the same complaint before the call center personnel escalate the matter for investigation and error correction.

169.    In April 2015, Ocwen implemented new policies and procedures to address the difficulty its call center personnel had in recognizing and escalating borrower complaints. These policies and procedures, however, were not reasonably designed to handle consumer complaints. For example, instead of requiring Ocwen to identify a complaint the first time a borrower calls in, the new policies and procedures place the burden on the borrower to complain multiple times—at least five times in nine days— before Ocwen will automatically escalate their complaint for resolution to an Escalation Relationship Manager.

170.    As a result, many borrowers have been forced to call Ocwen multiple times before Ocwen investigated and corrected their error. For example, of the more than 450,000 complaints that Ocwen processed from April 2015 through April 2016, approximately 68 percent involved borrowers who contacted Ocwen multiple times within a 15-day period; approximately 40 percent involved borrowers who contacted

# Exhibit A

Ocwen three or more times within a 15-day period; and approximately 17 percent involved borrowers who contacted Ocwen five or more times within a 15-day period.

171.    Ocwen's policies and procedures have not been reasonably designed to ensure that its personnel conduct reasonable investigations of the alleged error in complaints. Ocwen's policies and procedures, for instance, direct Ocwen personnel to rely on the information in REALServicing to investigate complaints. Thus, Ocwen's ability to appropriately investigate complaints is largely dependent on the accuracy of the information contained within REALServicing. Further, Ocwen's policies and procedures provide little to no guidance to personnel on how to document the step-by-step basis for their conclusions regarding the validity of an alleged error.

172.    Ocwen's policies and procedures also provide little or no guidance to personnel about how to correct errors. For example, Ocwen's policies and procedures do not detail what factors personnel should consider when recommending remediation, including what types of harms and downstream impacts to borrowers they should consider. At best, Ocwen's policies and procedures identify certain forms of remediation such as fee waivers and credit reporting corrections, but do not inform personnel when these or other forms of remediation are appropriate. Without such guidance, Ocwen personnel are left to their own discretion to determine whether an error has occurred, and, if so, how to correct the error.

173.    Second, as a result of Ocwen's above policies and procedures, which also apply to NOEs, Ocwen has failed to conduct reasonable investigations and/or, where appropriate, make corrections of errors in borrowers' complaints and NOEs. Among other things, Ocwen has relied on inaccurate data in REALServicing, and the Ocwen personnel who investigate borrowers' complaints and NOEs are not required to cross-

# Exhibit A

reference Ocwen's known and documented systemic errors, such as the payment

processing and application, escrow, and insurance errors, and thus do not consider that

information in their investigations. Further, in responding to certain complaints and

NOEs, Ocwen has simply parroted back the information in REALServicing, including

details set forth in payment and escrow histories, without addressing the errors

presented by borrowers.

> 3.   *Ocwen's consumer complaint and NOE handling failures have caused significant borrower harm.*

174.   Ocwen's failure to properly investigate consumer complaints and NOEs

and correct errors has caused significant consumer harm.

175.   Ocwen's consumer complaint and NOE failures are illustrated by the

experience of several borrowers, including those described in Paragraphs 97, 98, 99,

124, 125, 126, 142, 143, 162, 211, and 212, who complained to Ocwen multiple times in

order to try to get Ocwen to correct errors.

176.   One borrower repeatedly contacted Ocwen throughout 2014 to have

Ocwen correct an error with her escrow account. When the borrower's loan was

transferred to Ocwen in August 2013, Ocwen set up an escrow account and incorrectly

began making disbursements for property taxes and property insurance, even though

the borrower had a tax deferment as part of a program for low income-seniors and paid

her own property insurance. In July 2014, Ocwen sent the borrower a notice of default,

which included an escrow balance of $3,841.92, late fees, and other fees and charges.

After the borrower was unable to get Ocwen to resolve her dispute, she submitted,

through AARP's Legal Counsel for the Elderly, a Qualified Written Request and NOE

regarding the escrow mistakes and the related errors. Ocwen's response only contained

# Exhibit A

generic account information and did not correct the errors. It was only after the
borrower's counsel sent Ocwen another complaint to the Bureau in October 2014 that
Ocwen responded, in a letter dated December 17, 2014, in which it stated it would
remove the borrower's escrow balance, waive late fees, and reduce the borrower's
payment amount to $302.43, which was the original and correct amount of the
borrower's payment.

<b>H.    Ocwen has engaged in unlawful foreclosure practices.</b>

177.    Ocwen has long touted its ability to service and modify distressed loans,
claiming, "helping homeowners is what we do." In fact, Ocwen has failed to accurately
maintain foreclosure-related information necessary to ensure that it provides borrowers
with required foreclosure protections. As a result of these and other failures, Ocwen has
wrongfully initiated foreclosure proceedings and wrongfully conducted foreclosure
sales.

1.    <i>Ocwen's obligations under Regulation X and the CFPA.</i>

178.    Regulation X provides borrowers with a variety of protections when they
apply for a loan modification or other loss mitigation option, such as a short sale, in
connection with a mortgage secured by their principal residence. Several of these
protections are triggered once the borrower submits an oral or written application for a
loss mitigation option.

179.    Under Regulation X, if a servicer receives a loss mitigation application 45
days or more before a foreclosure sale, it must provide the borrower an
acknowledgement letter within five days that states whether the application is
"complete," and, if it is not, what additional documents and information the borrower
must submit to complete the application ("Acknowledgment Letter"). A loss mitigation

53

# Exhibit A

application is complete under Regulation X when the servicer has received all of the
information it requires from a borrower to evaluate the borrower's application for all
available loss mitigation options ("Complete Application"). An application is facially
complete under Regulation X if a borrower provides the information and documentation
that the servicer requests in the Acknowledgment Letter or if no additional information
is requested in the Acknowledgment Letter ("Facially Complete Application").

180.    Regulation X also requires that, if a servicer receives a Complete
Application more than 37 days before a foreclosure sale, it must evaluate the borrower
for all available loss mitigation options and provide the borrower with a written notice
within 30 days indicating, among other things, whether it will offer the borrower any
loss mitigation options ("Evaluation Notice").

181.    Regulation X also includes requirements relating to a servicer's access to
and ability to exchange information with its service providers. Regulation X generally
requires a servicer to, among other things, have policies and procedures reasonably
designed to ensure that the servicer is providing appropriate servicer personnel with
access to accurate and current documents and information reflecting actions performed
by its service providers, such as foreclosure attorneys responsible for handling Ocwen's
foreclosure proceedings.

182.    Regulation X also generally prohibits servicers from, among other things,
commencing a first notice or filing of a foreclosure ("First Filing"), obtaining a
foreclosure judgment, or conducting a foreclosure sale if: (1) the servicer discovers that
additional information or corrections to a previously submitted document are required
to complete a Facially Complete Application and the borrower has not had a reasonable
opportunity to complete the application; (2) the servicer has timely received a Complete

# Exhibit A

Application but has not yet evaluated the application; (3) the time for the borrower to respond to a loss mitigation offer or to appeal a loan modification denial has not expired; or (4) the borrower is performing upon a loss mitigation agreement (*e.g.*, a trial loan modification or short-term payment forbearance program).

183.    In addition, a servicer is prohibited from engaging in unfair, deceptive, and abusive acts and practices, including in the context of foreclosure activity, under the CFPA.

        2.    *Ocwen's deficient foreclosure policies and procedures violate Regulation X.*

184.    Ocwen uses foreclosure attorneys to provide it with various foreclosure services, including commencing and completing foreclosures upon borrowers' loans, and placing "foreclosure holds" on borrowers' accounts to prevent the initiation of a foreclosure or obtain a stay or postponent of a foreclosure. Ocwen's policies and procedures relating to its foreclosure attorneys are deficient, however, as they fail to ensure that Ocwen receives accurate and current information reflecting its foreclosure attorneys' actions.

185.    From at least 2014 through at least April 2016, Ocwen has been aware that it has not received timely or accurate information from its foreclosure attorneys. For example, in 2014, Ocwen's auditors found that one of Ocwen's largest foreclosure law firms in Florida had failed to timely update Ocwen's system with current foreclosure sale dates for 100 percent of the loan files tested. In response to this finding, the firm explained that it "continues for have periodic, on-going access issues within [Ocwen's systems], which at times hinders our ability to comply with the several issues noted during the audit." In another 2014 audit, Ocwen found that another of Ocwen's Florida

# Exhibit A

foreclosure law firms had failed to upload documents to Ocwen's system for 100 percent
of the loan files tested.

186.    The deficiency of Ocwen's policies and procedures was highlighted again
in 2015 when Ocwen's auditors found that its foreclosure law firms had failed to provide
Ocwen with timely and accurate information. For example:

- In a 2015 audit of one the Ocwen's foreclosure law firms in Florida referenced in
  Paragraph 185, Ocwen found that the firm was still not accurately updating
  Ocwen's system with the correct foreclosure milestone dates. Ocwen described
  the impact as follows: "When incorrect data is inputted into the system, Ocwen
  staff is unaware of the current status of the foreclosure proceedings" and presents
  "data integrity issues." In response to the 2015 audit, the firm pointed out that
  transferred loans may contain incorrect dates, but stated that it could not update
  those loan files because there was a "hold" placed on transferred loans.

- In another 2015 audit, Ocwen found that of one of its Oregon foreclosure firms
  had failed to timely upload documentation to Ocwen's system for 80 percent of
  the loan files tested. The audit report listed the cause as "Some of the Firm
  personnel are not familiar with [Ocwen's system] document upload."

- In another 2015 audit of one of its foreclosure firms in New Jersey, Ocwen found
  that the firm had failed to upload all documents to Ocwen's systems for 60
  percent of the loan files tested "result[ing] in missing documentation [in Ocwen's
  system] for SCRA [Servicemembers Civil Relief Act] and PACER checks." The
  audit identified the reason for the failure as: "The Firm was unaware of the
  requirement for filed and or recorded documentation to be uploaded [to Ocwen's
  system]." Ocwen's auditors also described the impact of the failure: "Failure to

# Exhibit A

upload documents to [Ocwen's system] affects the [ability of the] servicer to view and ensure all documents completed by the attorney were accurate."

187.    The audit findings for these firms are not outliers. In March 2016, Ocwen conducted an internal audit of its foreclosure operations and found, for foreclosures initiated between July and December 2015, that:

- "Foreclosure documents are not consistently uploaded on [Ocwen's system] by attorney firms. In 15 (13%) of 120 foreclosure initiation events reviewed, documents were not uploaded to [Ocwen's system] by external counsel."

- "Delays occur in uploading foreclosure related documents on [Ocwen's system]. In 12 (30%) of 40 foreclosure initiation events reviewed, documents were uploaded to [Ocwen's system] by external counsel between 3 and 11 days after event completion."

- "Publication dates updated in [Ocwen's system] by external attorneys do not accurately reflect the event completion date. A review of 30 foreclosures with a 'Publication Completed' event date updated in [Ocwen's system] identified 18 (60%) where documentation did not support the event completion date in [Ocwen's system]."

188.    Key Ocwen personnel have also been aware that Ocwen's foreclosure attorneys' failure to provide accurate and current information has negatively impacted Ocwen's ability to service loans. In December 2015, Ocwen's Head of Loss Mitigation testified that he became aware earlier in 2015 that Ocwen's systems had missing or inaccurate foreclosure sale dates. He explained that Ocwen Loss Mitigation employees rely on  theforeclosure sale date to, among other things, determine how many days to grant borrowers to return missing documents in connection with their loss mitigation

57

# Exhibit A

applications. He further testified that he reached out to Ocwen's Head of Foreclosure to inform him that the Loss Mitigation department needed foreclosure sale dates in the system and asked him to work with Ocwen's foreclosure attorneys to ensure that they input these dates into Ocwen's system, but he was unaware of what actions, if any, Ocwen took to ensure that this actually occurred.

189.   In May 2016, Ocwen's Head of Foreclosure also testified that he was aware that Ocwen's foreclosure attorneys had not always provided Ocwen with timely and accurate foreclosure information. He further testified that:

- Some of Ocwen's attorney managers tested the accuracy of the data Ocwen's foreclosure firms entered into Ocwen's systems, but acknowledged that not all of Ocwen's attorney managers follow this practice and that the practice was not required by Ocwen's policies and procedures.

- Ocwen's system prevents foreclosure attorneys from making any changes to the foreclosure sale date when there is foreclosure hold on an account, and that Ocwen did not have a policy that required its foreclosure attorneys to contact Ocwen with any updated foreclosure sale date information (since they could not make changes in the system) when a foreclosure hold was in place.

190.   As a result of Ocwen's policies and procedure deficiencies, Ocwen has initiated foreclosures, obtained foreclosure judgments, and conducted foreclosure sales on borrowers' accounts in which Ocwen had placed a foreclosure hold. As of May 2016, Ocwen has maintained a daily report, which it calls the "Dual Tracking Report," that tracks the date, identity of the borrower, and reasons why Ocwen initiated a foreclosure, obtained a foreclosure judgment, or conducted a foreclosure sale even though a borrower's account had a foreclosure hold.

# Exhibit A

191.    Below are two charts from one of Ocwen's Dual Tracking Reports. The first chart catalogues instances where Ocwen initiated a foreclosure proceeding even though Ocwen had placed a foreclosure "hold" on the loan, a process known as "dual tracking." The chart identifies the reason or root cause for each "[d]ual [t]rack violation," such as "attorney proceeded while the file was on hold." The chart shows that, by Ocwen's own analysis, between November 2015 and April 2016, Ocwen attorneys initiated one hundred and twenty foreclosure proceedings when the subject loan was subject to a foreclosure hold.



192.    The second chart below indicates the reasons that borrowers' accounts were subject to foreclosure holds. It shows that the vast majority of the foreclosure holds that Ocwen violated were in place because borrowers had submitted a completed loan modification package, and thus were potentially subject to Regulation X foreclosure protections.

---

# Exhibit A



3.   *Ocwen initiated foreclosures and conducted foreclosure sales in violation of Regulation X and the CFPA.*

193.   Ocwen has initiated First Filings, obtained foreclosure judgments, and conducted foreclosure sales in violation of Regulation X and the CFPA in at least five ways.

194.   First, Ocwen has inappropriately made at least one thousand foreclosure First Filings at the time that it was still evaluating Complete Applications it had previously and timely received from borrowers on or after January 10, 2014.

195.   Second, in numerous instances, Ocwen has inappropriately obtained foreclosure judgments and conducted foreclosure sales on the homes of borrowers who had a mortgage secured by their principal residence, had timely sent Ocwen a Complete Application more than 37 days before a pending foreclosure sale on or after January 10, 2014, and: (1) were still waiting for Ocwen to evaluate their Complete Application; (2) still had time to accept loss mitigation options that Ocwen had offered to them; or (3) were performing upon loss mitigation agreements.

# Exhibit A

196.    Third, in numerous instances, Ocwen has inappropriately conducted foreclosure sales on the homes of borrowers who had a mortgage secured by their principal residence and had timely sent Ocwen a Facially Complete Application more than 37 days before a pending foreclosure sale on or after January 10, 2014. After these borrowers submitted Facially Complete Applications, Ocwen determined it needed additional information. Ocwen sent these borrowers a letter requesting that they submit the additional information and gave the borrowers a deadline, usually 30 days, to submit that information, but then foreclosed on the borrowers before that deadline.

197.    Fourth, in numerous instances, Ocwen has inappropriately conducted foreclosure sales on the homes of borrowers before the deadline it provided these borrowers to submit missing documents. These borrowers had submitted incomplete applications for loss mitigation assistance. Ocwen sent the borrowers letters requesting that they submit the missing documents or information and gave the borrowers a deadline, but then foreclosed before that deadline.

198.    Ocwen's Head of Loss Mitigation has conceded that foreclosing on borrowers before the deadlines it communicated to borrowers to submit additional or missing information is deceptive and confuses borrowers. These representations are material to borrowers and are likely to mislead borrowers acting reasonably under the circumstances. These borrowers reasonably interpret Ocwen's request for additional or missing information to evaluate the borrowers' loss mitigation applications to mean that Ocwen will not foreclose on them before the expiration of the deadline Ocwen provided for submitting the additional or missing information.

199.    In an email with the subject "Sale Date before Missing Doc Expiration," an official in Ocwen's Loss Mitigation department wrote:

# Exhibit A

> Please confirm if our missing letter states that if they don't send a complete package we will go ahead with sale irrespective of the missing doc due date. To me **that does not sound right, where we inform the borrower to send in documents by a date but go ahead with sale prior to expiration of that date**. (Emphasis added.)

The Head of Ocwen's Loss Mitigation Department agreed, responding:

> **If there is no denial on the current instance you should not be going to sale, period.** Even though we have disclosure language around 37 days before FC and 7th day at midnight **you will get hit with UDAP every single time** you do not follow the rules above. You need to think like the customer which is without a denial you will still think you have time. (Emphases added)

200.    Fifth, Ocwen has inappropriately conducted foreclosure sales on the homes of borrowers who were performing upon agreements for loss mitigation options, such as a loan modification. The borrowers accepted and were performing upon the terms of the options—for example, by making trial payments according to the terms of a loan modification. Even though the borrowers had been doing everything they were supposed to do, Ocwen unilaterally breached the terms of its loss mitigation agreements with borrowers and foreclosed on their loans.

       4.    *Ocwen's foreclosure failures have caused significant borrower harm.*

201.    Aside from the obvious harm to any borrower whose home is wrongfully foreclosed upon, Ocwen's illegal foreclosure practices have also caused significant financial harm, emotional distress, negative credit reporting, and other harm to borrowers.

## IV.    OCWEN HAS FAILED TO PROVIDE COMPLETE AND ACCURATE LOAN INFORMATION TO NEW SERVICERS

202.    Since 2015, Ocwen has sold hundreds of thousands of its rights to service borrowers' loans, also referred to as mortgage servicing rights ("MSRs"), to new

# Exhibit A

mortgage servicers. Ocwen has failed, however, to provide complete and accurate borrower loan information to the new servicers or to notify new servicers of errors that are likely to impact the accuracy and completeness of the transferred borrower records.

### A.    Ocwen's obligations under Regulation X.

203.    Regulation X requires a transferor servicer to maintain policies and procedures reasonably designed to ensure that it can timely transfer all information and documents in its possession or control relating to the transferred loan to the new servicer in a form and manner that ensures the accuracy of the transferred information and documents and that enables the new servicer to comply with applicable laws and the terms of the new servicer's obligations to the owner or assignee of the mortgage loan ("investor guidelines").

### B.    Ocwen's failure to comply with Regulation X.

204.    Ocwen has failed to comply with Regulation X's policy and procedure requirements relating to transfers in at least two ways.

205.    The first deficiency in Ocwen's policies and procedures relates to the *form and manner* in which Ocwen has transferred borrower loan information to new servicers. As part of a loan transfer, Ocwen provides new servicers with raw loan-level borrower data, but does not provide adequate means to interpret that data. In particular, Ocwen's policies and procedures do not require it to provide new servicers with a complete and accurate data dictionary that defines the more than 10,000 comment codes and flags that Ocwen has used to service borrowers' loans. Instead, Ocwen's policy calls for the production of a more limited data dictionary that only includes the current definitions for the comment codes and flags, but omits the historic definitions of comment codes or flags whose use or meaning has changed over time. As a

# Exhibit A

result, new servicers have no way of knowing the meaning of the codes or flags in borrower account history or how they were used.

206.    Ocwen has also provided new servicers with summary reports for certain populations of borrowers, such as those in loss mitigation or foreclosure. But these reports omit critical information that the new servicer needs to provide borrowers with the protections to which they are entitled under applicable law, and Ocwen's policies and procedures do not require it to provide this information to the new servicer. For example, prior to November 2015, Ocwen failed to provide information for the loans being transferred in a form that new servicers could understand whether borrowers had:

- A foreclosure sale date close to the transfer date, which new servicers needed in order to avoid erroneously foreclosing on the borrower, who may have been entitled to protections under Regulation X or other applicable laws; and

- Previously filed for bankruptcy and had obtained a discharge in that proceeding, which the new servicer would need to know in order to comply with applicable federal law and bankruptcy court orders.

207.    Second, Ocwen's policies and procedures have failed to ensure that, prior to transferring loans to a new servicer, Ocwen has *disclosed known inaccuracies and errors that may or have impacted the accuracy or completeness* of the transferred borrower loan records and the new servicer's ability to comply with applicable law and investor guidelines. Ocwen has not disclosed, for example, errors it tracks in its Risk Convergence Reports or audit findings that Ocwen knew or should have known impacted the accuracy or completeness of the loan information and the new servicer's ability to comply with applicable law and investor guidelines.

# Exhibit A

208.    Ocwen's Head of Servicing Transfers testified, for example, that he was not aware if Ocwen had disclosed to new servicers that Ocwen had:

- Incorrectly calculated certain borrowers' reinstatement quotes, including those in demand letters and foreclosure affidavits;

- Failed to credit payments made by up to 10,000 borrowers to satisfy their escrow shortages;

- Failed to make payment changes relating to escrow changes for up to 22,000 borrowers in bankruptcy; and

- Initiated unlawful foreclosure proceedings upon borrowers, in violation of Regulation X.

### C.    Ocwen's failure to transfer complete and accurate borrower records has caused significant borrower harm.

209.    Ocwen's failure to transfer complete and accurate borrower records and disclose known errors to new servicers impacts borrowers after their loans have been transferred to a new servicer.

210.    According to Ocwen's records, from April 2015 to April 2016, Ocwen received more than 6,800 complaints from borrowers related to the transfer of their loans by Ocwen to a new servicer.

211.    For example, one borrower complained that his monthly payment amount increased by 47 percent when Ocwen failed to correct its escrow errors before transferring the borrower's loan to a new servicer. In June 2014, Ocwen approved the borrower for a loan modification agreement that reduced his monthly payment to $1,639.07. Around November 2015, Ocwen transferred the borrower's loan to a new servicer. In March 2016, the new servicer conducted an escrow analysis and determined

65

# Exhibit A

that the borrower had an escrow shortage of $9,164.13, and that, as a result, the

borrower's payment would increase by $777.49, from $1,639.07 to $2,398.54. The

borrower contacted Ocwen when the new servicer was unable to explain why the

borrower had such a large escrow shortage. In a June 1, 2016 letter, Ocwen admitted

that it had made an "error in its escrow application at the time of modification." As a

result, Ocwen only capitalized a portion of the borrower's total escrow balance when it

modified the borrower's loan. To correct its error and unbeknownst to the borrower,

Ocwen reduced the balance in the borrower's escrow account two days before

transferring the loan that left the borrower's escrow account with a negative balance of

$4,440.91. The borrower reports that he was eventually forced to retain an attorney, pay

more than $5,000 in legal fees to ensure that Ocwen correct its error, and obtain a new

repayment plan with the new servicer to cover the escrow shortage.

212.    Another borrower complained that Ocwen did not transfer complete

information about his payments and loan modification to the new servicer. As a result,

the new servicer refused to recognize the borrower's loan modification and stated that

the borrower owed more than $10,000 in past due payments. When the borrower

complained to Ocwen, it admitted in a letter that the borrower had made his required

modification payments but that Ocwen had failed to properly apply the funds. Ocwen

also admitted that it had been attempting to correct its payment application error

through a reversal request on the borrower's account so it could reapply the borrowers'

payments, but had incorrectly processed the reversal request. And then before Ocwen

could complete its second attempt at a reversal request to fix its error, Ocwen had

transferred the loan to the new servicer. Instead of alerting the new servicer to its

mistakes, Ocwen had simply transferred the borrower's loan, leaving the $19,182.69 in

# Exhibit A

payments that the borrower had made pursuant to his loan modification agreement in a suspense account.

## V. OCWEN HAS FAILED TO SUFFICIENTLY REMEDIATE HARM TO BORROWERS

213.    Ocwen is aware that its servicing failures have caused significant harm to borrowers and that these failures can have devastating consequences.

214.    Despite its awareness of the harm it has caused, Ocwen has had no consistent policy, procedure, or practice for providing borrower remediation, even when it has identified a systemic failure that could harm numerous borrowers.

215.    Ocwen has lacked a systematic process to track and analyze errors it learns of through borrower complaints or NOEs to determine whether other borrowers may have been harmed by the same errors. As a result, Ocwen has typically only corrected errors or provided remediation to those borrowers who have complained (assuming Ocwen recognizes the call as an actual complaint, investigates, and/or makes a correction) or submitted an NOE, but generally has not corrected the same or similar errors for other borrowers who did not complain.

216.    Ocwen also has not had policies or procedures requiring it to determine whether a risk item on its Risk Convergence Report has impacted or harmed borrowers, or whether borrower remediation is required, before it "closes" that risk item.

217.    Instead, Ocwen has focused on operational remediation to correct the error and prevent any *future* impact on borrowers. As a result, in many instances, Ocwen has failed to identify the borrower population that was impacted by a given risk item or to provide full remediation to that population. Instead, Ocwen generally

# Exhibit A

provides borrower remediation only when a borrower complains to Ocwen or when a

court or regulator requires Ocwen to provide a borrower with relief.

218.    As Ocwen's former Head of Servicing Compliance testified in May of 2016:

> The company didn't have a policy or a protocol [for borrower
> remediation]. And with all of the issues, you saw how many
> issues there were [on the Risk Convergence Report], there
> just wasn't an appetite to back up and create an approach to
> this. Would I have liked that to have happened, I would have
> loved it, but it did not happen and there wasn't an appetite
> for it.

219.    Ocwen's "appetite" for borrower remediation appears to have been further

diminished when the remediation could have a significant financial impact on Ocwen.

For example, in one email, Ocwen personnel discussed Ocwen's auditors' findings that

Ocwen lacked "processes to review and ensure compliance with state laws for negative

amortization" relating to adjustable rate mortgages, and whether to review impacted

loans and provide borrowers with remediation. After analyzing the potential $21 million

in costs for Ocwen to remediate, Ocwen declined to do so due to the "substantial,

negative financial impact and Legal confirmation that [Privileged material redacted] is

sufficient justification to forego the lookback."

220.    Ultimately, Ocwen's former Head of Compliance conceded in testimony

that Ocwen should remediate borrowers who were harmed by Ocwen's errors and

suffered potential harm. When asked if Ocwen did so, she conceded: "Could the

company have done more? Absolutely."

# Exhibit A

## **VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT**

221.    Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531 and 5536(a)(1)(B), prohibit covered persons from engaging "in any unfair, deceptive, or abusive act or practice."

222.    Acts or practices are unfair under the CFPA if "the act or practice causes or is likely to cause substantial injury to consumers which are not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c).

223.    An act or practice is deceptive if it misleads or is likely to mislead the consumer; the consumer's interpretation is reasonable under the circumstances; and the misleading act or practice is material.

224.    Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(B), prohibits covered persons from committing any act or omission in violation of a Federal consumer financial law.

225.    Section 1002(14) of the CFPA, 12 U.S.C. § 5481(14), defines the FDCPA, RESPA, TILA, and HPA as Federal consumer financial laws.

### **COUNT I**
### **Ocwen's Use of Inaccurate and Incomplete Information to**
### **Service Loans is Unfair**

226.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

227.    In numerous instances since January 2014, Ocwen has used inaccurate and incomplete information to service borrowers' loans because it has input inaccurate and incomplete information about borrowers into its REALServicing system of record, REALServicing has generated inaccurate information about borrowers' loans due to

# Exhibit A

system deficiencies, and/or Ocwen's manual processes have themselves resulted in errors. This inaccurate and incomplete information relates to borrowers':

  a. Loan terms, including interest rate(s), balloon payments, and maturity dates;

  b. Amounts received from and owed by borrowers, including monthly payments and the date Ocwen received the payments, unpaid fees, payoff amounts, and reinstatement amounts;

  c. Escrow amounts, including borrowers' escrow balances, disbursements made on behalf of borrowers, and escrow shortages;

  d. Insurance coverage, disbursements, and amounts due, including premiums Ocwen charged to borrowers for hazard insurance, flood insurance, and purchase mortgage insurance; and/or

  e. Loss mitigation and foreclosure information, including information required of borrowers to complete loss mitigation applications, terms of loan modification agreements, and the dates of pending foreclosure sales.

228. Ocwen's use of inaccurate or incomplete information to service loans causes or is likely to cause substantial injury to consumers, such as the unlawful commencement of foreclosures, unlawful foreclosure sales, improper handling of loss mitigation applications, misapplication of borrowers' payments, collection and billing of inaccurate and incorrect amounts, imposition of inappropriate fees and charges, inaccurate delinquency statuses, inaccurate negative credit reporting, and/or emotional distress.

# Exhibit A

229.    These injuries cannot be reasonably avoided by consumers, who do not

choose their mortgage servicer, and are not outweighed by countervailing benefits to

consumers or competition.

230.    Ocwen's acts and practices as described in Paragraph 227 constitute unfair

acts and practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§

5531(a) and (c) and 5536(a)(1)(B).

## COUNT II
### Ocwen's Deceptive Acts and Practices Regarding Loan Terms and Status

231.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

232.    In numerous instances since January 2014, in the course of servicing

mortgage loans and collecting debts from consumers, Ocwen has represented to

borrowers, directly or indirectly, expressly or by implication, that their loans have

certain unpaid balances; monthly payments; delinquency statuses; unpaid fees;

reinstatement amounts; escrow amounts due; payoff amounts due; insurance amounts

due; and/or other amounts due.

233.    In truth and fact, in numerous instances the material representations set

forth in the above-referenced Paragraph 232 were false, misleading, or were not

substantiated at the time the representations were made, including but not limited to

representations made where Ocwen had knowledge or reason to believe that:

     a.    The prior servicer data and records upon which it was relying were

          inaccurate or missing but it had failed to obtain or review information

          substantiating the accuracy of the data prior to collecting or foreclosing

          on borrowers' loans;

# Exhibit A

    b.  Its system of record contained inaccurate information due to system errors and limitations, manual entry errors, and incorrect information provided by service providers but it had failed to obtain or review information substantiating the accuracy of the data prior to collecting or foreclosing on borrowers' loans; and/or

    c.  Consumers had disputed, challenged, or questioned the validity or accuracy of Ocwen's information but it had failed to obtain or review information substantiating the accuracy of the information, or failed to consider the consumers' disputes, prior to collecting or foreclosing on borrowers' loans.

234.    Ocwen's acts and practices as described in Paragraphs 232-233 constitute deceptive acts and practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

**COUNT III**
**Ocwen's Unfair Foreclosure Practices**

235.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

236.    In numerous instances since January 2014, in connection with servicing mortgage loans, Ocwen has unilaterally breached contracts with borrowers by foreclosing on their loans even though the borrowers were performing on agreements on loss mitigation options.

237.    Ocwen's actions caused or were likely to cause substantial injury to borrowers that borrowers could not reasonably avoid themselves and that are not outweighed by countervailing benefits to borrowers or to competition.

# Exhibit A

238.    Ocwen's acts and practices as described in Paragraph 236 constitute unfair acts and practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c) and 5536(a)(1)(B).

## COUNT IV
### Ocwen's Deceptive Foreclosure Communications

239.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

240.    In numerous instances since 2014, in connection with servicing mortgage loans, Ocwen misrepresented, directly or indirectly, expressly or by implication, that borrowers had a certain amount of time, typically 30 days, to submit additional information that Ocwen needed to complete and evaluate their loss mitigation applications and that borrowers would not be foreclosed on while that request was pending.

241.    In truth and in fact, while Ocwen's requests for additional information it needed to complete and evaluate borrowers' loss mitigation applications were pending, Ocwen would foreclose on the borrowers.

242.    The representations set forth in Paragraphs 240 were false or misleading and were material to borrowers' decisions relating to their mortgages.

243.    Ocwen's acts and practices as described in Paragraphs 240-241 constitute deceptive acts and practices in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## COUNT V
### Ocwen's Unfair Billing and Processing of Payments for Add-On Products

244.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

245.    In numerous instances since July 2011, in connection with Ocwen's servicing of a borrower's mortgage loan, Ocwen enrolled consumers in add-on products

# Exhibit A

without their consent and then billed, collected, and processed payments from these consumers.

246.    Ocwen's actions caused or were likely to cause substantial injury to borrowers that borrowers could not reasonably avoid themselves and that are not outweighed by countervailing benefits to borrowers or to competition.

247.    Ocwen's acts and practices as described in Paragraph 245 constitute unfair acts and practices in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c) and 5536(a)(1)(B).

### COUNT VI
### Ocwen's Deceptive Marketing of Add-On Products

248.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

249.    In numerous instances since July 2011, while marketing and soliciting borrowers to enroll in add-on products in connection with its servicing of mortgage loans, Ocwen has represented, directly or indirectly, expressly or by implication, that the borrower was receiving a cash voucher or a refund check.

250.    In truth and in fact, Ocwen was soliciting the consumer to enroll in add-on products. In numerous instances, Ocwen failed to disclose, or disclose adequately, the material terms and conditions of the offer, including that in order to redeem the voucher or check the borrower had to enroll in an add-on product, which included a monthly fee. In numerous instances, Ocwen also failed to disclose or disclose adequately that in order to redeem the voucher, borrowers had to remain enrolled in the add-on product for at least a year and pay monthly fees, and that the borrowers would receive the value of the voucher in quarterly installments.

74

# Exhibit A

251.    The representations set forth in Paragraphs 249-250, and Ocwen's failure to disclose, or disclose adequately, the material terms and conditions of the offer, constitute deceptive acts and practices in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## VIOLATIONS OF THE TRUTH-IN-LENDING ACT

252.    TILA and its implementing regulation, Regulation Z, at 12 C.F.R. § 1026.36(c)(1), prohibit certain acts and practices and contain certain requirements relating to payment processing in connection "with a consumer credit transaction secured by a consumer's principal dwelling."

253.    "Consumer credit" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(12) means, "credit offered or extended to a consumer primarily for personal, family, or household purposes."

254.    "Credit" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(14) means "the right to defer payment of debt or to incur debt and defer its payment."

255.    A "dwelling" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(19), means a "residential structure that contains one to four units, whether or not that structure is attached to real property. The term includes an individual condominium unit, cooperative unit, mobile home, and trailer, if it is used as a residence."

256.    Ocwen is the servicer of consumer credit secured by consumers' principal dwellings where it services mortgages that have been extended to consumers primarily for personal, family, or household purposes and secure consumers' principal residential structures that contains one to four units.

# Exhibit A

## COUNT VII
### Ocwen's Failure to Timely and Appropriately Credit Payments

257.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

258.    As of January 10, 2014, Regulation Z generally requires Ocwen, when it receives a full periodic payment, to credit the payment as of the date of receipt unless the failure to do so does not result in a charge to the borrower or negative reporting. 12 C.F.R. § 1026.36(c)(1)(i). If Ocwen retains a partial payment, or a payment less than the full periodic payment, which it holds in a suspense or unapplied funds account, Ocwen must also, after an accumulation of sufficient funds to cover a periodic payment, treat such funds as a periodic payment. 12 C.F.R. § 1026.36(c)(1)(ii).

259.    Further, under Regulation Z, Ocwen must, subject to certain exceptions, provide borrowers with a monthly periodic statement or billing statement detailing information such as the amount due, how Ocwen will break down and apply monthly payments, all payments received since the last statement, the total of all payments received since the beginning of the current calendar year, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account. 12 C.F.R. § 1026.41(d).

260.    In numerous instances since January 10, 2014, Ocwen has failed to timely and appropriately credit full periodic payments made by borrowers as of the date of receipt.

261.    In numerous instances since January 10, 2014, Ocwen has failed to timely and appropriately credit borrowers' payments it is holding in suspense accounts, where Ocwen, after an accumulation of sufficient funds to cover a periodic payment in

76

# Exhibit A

borrowers' suspense accounts, has failed to treat such funds as a periodic payment as of the date of receipt.

262.    In numerous instances since January 10, 2014, Ocwen has failed to send borrowers periodic statements accurately detailing information such as the amount due, how Ocwen will break down and apply monthly payments, all payments received since the last statement, the total of all payments received since the beginning of the current calendar year, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account.

263.    The acts and practices described in Paragraphs 260-262 constitute violations of 12 C.F.R. §§ 1026.36(c)(1)(i) and (ii), 1026.41(d), and 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

264.    Section 808 of the FDCPA, 15 U.S.C. § 1692f, prohibits debt collectors, such as Ocwen, from engaging in unfair or unconscionable means to collect or attempt to collect any debt.

265.    Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits debt collectors, such as Ocwen, from using any false, deceptive, or misleading representation or means in connection with the collection of any debt. Section 807(2) prohibits the false representation of the character, amount, or legal status of the debt. Section 807(10) prohibits debt collectors from using any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

266.    The term "consumer" as defined in Section 803(3) of the FDCPA, 15 U.S.C. § 1692a(3), means "any natural person obligated or allegedly obligated to pay any debt."

# Exhibit A

267.    The term "debt" as defined in Section 803(5) of the FDCPA, 15 U.S.C. §

1692a(5), means "any obligation or alleged obligation of a consumer to pay money

arising out of a transaction in which the money, property, insurance or services which

are the subject of the transaction are primarily for personal, family, or household

purposes, whether or not such obligation has been reduced to judgment."

268.    The term "debt collector" as defined by Section 803(6) of the FDCPA, 15

U.S.C. § 1692a(6) means, in relevant part, any person who "uses any instrumentality of

interstate commerce or the mails in any business the principal purpose of which is the

collection of any debts" or who "regularly collects or attempts to collect, directly or

indirectly, debts owed or due or asserted to be owed or due another." It does not include

a person collecting debts owed to another to the extent the debts were not in default at

the time that the person obtained them. 15 U.S.C. § 1692a(6)(F)(iii).

269.    Ocwen acquires servicing rights to some mortgages that are in default at

the time of transfer and proceeds to collect on those mortgages. With respect to those

debts, Ocwen is a debt collector as defined by the FDCPA because it regularly collects or

attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or

due another and its collection activities are covered by the FDCPA.

**COUNT VIII**
**Ocwen's Use of Inaccurate and Incomplete Information to**
**Service Loans is Unfair**

270.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

271.    In numerous instances since January 2014, Ocwen has used inaccurate

and incomplete information, including incorrect data and incomplete or missing

documentation, to service borrowers' loans that were in default when Ocwen acquired

# Exhibit A

the rights to service such loans. This inaccurate and incomplete information relates to borrowers:

a. Loan terms, including interest rate(s), balloon payments, principals, including deferred principals, and maturity dates;

b. Amounts received from and owed by borrowers, including monthly payments and the date Ocwen received the payments, unpaid fees, payoff amounts, and reinstatement amounts;

c. Escrow amounts, including borrowers' escrow balances, disbursements made on behalf of borrowers, escrow surpluses, and escrow shortages;

d. Insurance coverage, disbursements, and amounts due, including premiums Ocwen charged to borrowers for hazard insurance, flood insurance, and purchase mortgage insurance; and

e. Loss mitigation and foreclosure information, including information required of borrowers to complete loss mitigation applications, terms of loan modification agreements, and the dates of pending foreclosure sales.

272. Ocwen's use of inaccurate or incomplete information to service loans causes or is likely to cause substantial injury to consumers, such as the unlawful commencement of foreclosures, unlawful foreclosure sales, improper handling of loss mitigation applications, misapplication of borrowers' payments, collection and billing of inaccurate and incorrect amounts, imposition of inappropriate late and other fees and charges, inaccurate delinquency statuses, inaccurate negative credit reporting, and/or emotional distress.

# Exhibit A

273.    These injuries cannot be reasonably avoided by consumers, who do not choose their mortgage servicer, and are not outweighed by countervailing benefits to consumers or competition.

274.    Ocwen's acts and practices as described in Paragraph 271 constitute unfair acts and practices in violation of Section 808 of the FDCPA. 15 U.S.C. § 1692f, and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## COUNT IX
## Ocwen's Deceptive Debt Collection Practices

275.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

276.    In numerous instances since January 2014, Ocwen has represented to borrowers whose loans Ocwen acquired the servicing rights to when the loan was in default, directly or indirectly, expressly or by implication, in communications with borrowers, that their loans have certain unpaid balances; monthly payments; delinquency statuses; unpaid fees; reinstatement amounts; escrow amounts due; payoff amounts due; insurance amounts due; and other amounts due.

277.    In truth and fact, in numerous instances the material representations set forth in the above-referenced Paragraph 276 were false or misleading, or were not substantiated at the time the representations were made, including but not limited to representations made where Ocwen had knowledge or reason to believe that:

        a.    The prior servicer data and records upon which it was relying were inaccurate or missing but it had failed to obtain or review information substantiating the accuracy of the data prior to collecting or foreclosing on borrowers' loans;

# Exhibit A

    b.  Its system of record contained inaccurate information due to system errors and limitations, manual entry errors, and incorrect information provided by service providers but it had failed to obtain or review information substantiating the accuracy of the data prior to collecting or foreclosing on borrowers' loans; and

    c.  Consumers had disputed, challenged, or questioned the validity or accuracy of Ocwen's information but it had failed to obtain or review information substantiating the accuracy of the information, or failed to consider the consumers' disputes, prior to collecting or foreclosing on borrowers' loans.

278.    The acts and practices described in Paragraphs 276-277 constitute violations of Sections 807(2) and (10) of the FDCPA, 15 U.S.C. §§ 1692e(2)(A) and 1692e(10) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

**VIOLATIONS OF THE REAL SETTLEMENT PROCEDURES ACT**

279.    RESPA and its implementing regulation, Regulation X, apply to "federally related mortgage loans," including the servicing of those loans, the administration of their escrow accounts, error resolution procedures, force-placed insurance, general servicing policies and procedures, and loss mitigation procedures.

280.    RESPA and Regulation X apply to the conduct of "servicers." Regulation X defines a servicer as a person "responsible for servicing of a federally related mortgage loan." Under Regulation X, "servicing" means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan . . . and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the

# Exhibit A

borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract."

281. Ocwen is a servicer under RESPA and Regulation X because it receives payments from borrowers pursuant to the terms of federally related mortgage loans and is responsible for, among other things, distributing the payments to investors who own the borrowers' loans and, when borrowers' loans include escrow accounts, to the borrowers' taxing authorities or insurance companies.

## COUNT X
### Ocwen's Escrow Violations

282. The Bureau incorporates by reference the allegations of Paragraphs 1-220.

283. As of January 10, 2014, Section 6(g) of RESPA, 12 U.S.C. § 2605(g) states that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due."

284. The requirements of Section 6(g) are further explained in Regulation X, 12 C.F.R. § 1024.17(k) and 34(a), which states "[i]f the terms of any federally related mortgage loan require the consumer to make payments to an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or before the deadline to avoid a penalty."

# Exhibit A

285.    In numerous instances since January 10, 2014, Ocwen has failed to pay borrowers' hazard insurance premiums in a timely manner as the payments became due.

286.    Section 1024.17 of Regulation X requires Ocwen to:

    a.    Conduct annual escrow analyses for borrowers, 12 C.F.R. § 1024.17(c)(3) and (f)(1);

    b.    Provide borrowers with annual escrow statements within 30 days of the completion of the escrow account computation year, 12 C.F.R. § 1024.17(i); and

    c.    Only collect escrow shortages when a shortage, in fact, exists, 12 C.F.R. § 1024.17(f)(3).

287.    In numerous instances since January 10, 2014, Ocwen has:

    a.    Failed to timely conduct annual escrow analyses for borrowers and, in some instances, failed to conduct the escrow analyses altogether;

    b.    Failed to provide borrowers with escrow statements within 30 days of the completion of the escrow account computation year and, in some instances, failed to provide the escrow statements at all; and

    c.    Collected escrow shortages that did not exist because it failed to timely process borrowers' escrow shortage payments.

288.    The acts and practices described in Paragraphs 285 and 287 constitute violations of Section 6(g) of RESPA and Regulation X, 12 C.F.R. §§ 1024.17(k), 1024.17(c)(3), 1024.17(i), 1024.17(f)(1) and (3), and 1024.34(a) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

# Exhibit A

## COUNT XI
## Ocwen's Notice of Error Violations

289.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

290.    As of January 10, 2014, Section 6(e)(2) and (k)(1)(c) of RESPA, 12 U.S.C. §§ 2605(e)(2) and (k)(1)(c), requires Ocwen to conduct an investigation of a qualified written request and make appropriate corrections to a consumer's account. Regulation X further explains that a qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error ("NOE") and that a servicer generally must either: (1) correct the error or errors identified by the borrower and provide the borrower with a written notification regarding the correction; or (2) conduct a reasonable investigation of an alleged error and provide the borrower with a written notification that indicates that the servicer has determined no error occurred and provides additional required information. 12 C.F.R. § 1024.35(a) and (e)(1).

291.    In numerous instances since January 10, 2014, Ocwen has failed to make appropriate corrections relating to NOEs when it finds errors in borrowers' accounts, and has failed to conduct reasonable investigations of NOEs.

292.    The acts and practices described in Paragraph 291 constitute violations of Section 6(e)(2) and (k)(1)(c) of RESPA, 12 U.S.C. §§ 2605(e)(2) and (k)(1)(c), and Regulation X, 12 C.F.R. §§ 1024.35(a) and 1024.35(e)(1) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## COUNT XII
## Ocwen's Servicing Policies and Procedures Violations

293.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

294.    As of January 10, 2014, pursuant to Regulation X, which was promulgated under Section 19(a) of RESPA, 12 U.S.C. § 2617(a), Ocwen must maintain policies and

# Exhibit A

procedures reasonably designed to ensure that it achieves the objectives set forth in 12

C.F.R. § 1024.38(b). 12 C.F.R. § 1024.38(a). These objectives include:

a. Providing "accurate and timely disclosures to a borrower as required by
[Subpart C of Regulation X] or other applicable law," 12 C.F.R. §
1024.38(b)(1)(i);

b. Investigating, responding to, and, as appropriate, making "corrections
in response to complaints asserted by a borrower," 12 C.F.R. §
1024.38(b)(1)(ii);

c. Upon notification of the death of a borrower, promptly identifying and
facilitating "communication with the successor in interest of the
deceased borrower with respect to the property secured by the
deceased borrower's mortgage loan," 12 C.F.R. § 1024.38(b)(1)(vi);

d. Providing Ocwen's personnel with access to "accurate and current
documents and information reflecting actions performed by service
providers," 12 C.F.R. § 1024.38(b)(3)(i); and

e. Timely transferring all information and documents in Ocwen's
possession or control relating to the transferred mortgage loans to a
transferee or new servicer "in a form and manner that ensures the
accuracy of the information and documents transferred" and enables
the new servicer to comply with the new servicers' obligations to the
owner or assignee of the mortgage loan and applicable law, 12 C.F.R.
§ 1024.38(b)(4)(i).

295.   In numerous instances since January 10, 2014, Ocwen has:

85

# Exhibit A

a. Failed to maintain policies and procedures reasonably designed to ensure that it sends borrowers accurate and timely escrow statements and periodic statements;

b. Failed to maintain policies and procedures reasonably designed to ensure that it is investigating, responding to, and, as appropriate, making corrections in response to complaints asserted by a borrower;

c. Failed to maintain policies and procedures reasonably designed to ensure that upon notification of the death of a borrower it promptly identifies and facilitates communication with successors, as evidenced by its failure to:

    i.    Promptly identify successors, which, in turn, impacted successors' assumption of the deceased borrower's loan and ability to obtain loss mitigation assistance; and

    ii.    Communicate to potential and actual successors Ocwen's requirements to confirm a person as a successor and obtain loss mitigation assistance;

d. Failed to maintain policies and procedures reasonably designed to provide appropriate Ocwen personnel with access to accurate and current documents and information reflecting actions performed by Ocwen's foreclosure attorneys; and/or

e. Failed to maintain policies and procedures reasonably designed to ensure that it could transfer all information and documents in a form and manner that ensures new servicers have complete and accurate

# Exhibit A

information and are able to comply with applicable laws by failing, prior to a transfer, to:

    i.    Transfer information in a form and manner that ensures new servicers have accurate borrower records and are able to comply with applicable laws; and

    ii.    Disclose to new servicers known errors or failures that impact or likely impact the accuracy of transferred borrower records and a new servicer's ability to comply with applicable laws.

296.    The acts and practices described in Paragraph 295 constitute violations of Sections 19(a) of RESPA, 12 U.S.C. § 2617(a) and Regulation X, §§ 12 C.F.R. 1024.38(a), 12 C.F.R. 1024.38(b)(1)(i), (ii), and (vi), 1024.38(b)(3)(i), and 1024.38(b)(4)(i), and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

**COUNT XIII**
**Ocwen's Foreclosure Violations**

297.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

298.    As of January 10, 2014, Regulation X, which the Bureau promulgated pursuant to Sections 6(j)(3), 6(k)(1)(C), 6(k)(1)(E) and 19(a) of RESPA, 12 U.S.C. §§ 2605(j)(3), (k)(1)(C), and (k)(1)(E), and 12 U.S.C. § 2617(a), provides borrowers with a variety of protections during their loss mitigation application and foreclosure processes.

299.    Under Regulation X, if a servicer receives a loss mitigation application, which is an oral or written request for a loss mitigation option that is accompanied by any information required by a servicer for evaluation for a loss mitigation option ("Loss

87

# Exhibit A

Mitigation Application"), from borrowers whose mortgage is secured by their principal residence, certain protections are triggered.

300.    Under Regulation X, if a servicer receives a Loss Mitigation Application 45 days or more before a foreclosure sale, it must send the borrower an acknowledgement letter within five days that indicates if the application is complete and, if it is not, states the additional documents and information that the borrower must submit to complete the application ("Acknowledgment Letter"). A Loss Mitigation Application is complete under Regulation X when the servicer has received all of the information it requires from a borrower to evaluate the borrower's application for all available loss mitigation options ("Complete Application"). An application is facially complete under Regulation X if a borrower provides the information and documentation that the servicer requests in the Acknowledgment Letter or if no additional information is requested in the Acknowledgment Letter ("Facially Complete Application").

301.    Regulation X also requires that, if a servicer receives a Complete Application more than 37 days before a foreclosure sale, it must evaluate the borrower for all available loss mitigation options and provide the borrower with a written notice within 30 days indicating, among other things, whether it will offer the borrower any loss mitigation options.

302.    Regulation X also generally prohibits servicers from, among other things, commencing a first notice of filing of a foreclosure ("First Filing"), obtaining a foreclosure judgment, or conducting a foreclosure sale if: (1) the servicer discovers that additional information or corrections to a previously submitted document are required to complete a Facially Complete Application and the borrower has not had a reasonable opportunity to complete the application; (2) the servicer has timely received a Complete

# Exhibit A

Application but has not yet evaluated the application; (3) the time for the borrower to respond to a loss mitigation offer or to appeal a loan modification denial has not expired; or (4) the borrower is performing upon a loss mitigation agreement (*e.g.*, a trial loan modification or short-term payment forbearance program).

303.    On or after January 10, 2014, Ocwen received Loss Mitigation Applications from borrowers whose mortgages are secured by their principal residences.

304.    On or after January 10, 2014, Ocwen received Complete Applications from borrowers whose mortgages are secured by their principal residences.

305.    On or after January 10, 2014, Ocwen received Facially Complete Applications from borrowers whose mortgages are secured by their principal residences.

306.    In numerous instances, Ocwen has made First Filings even though Ocwen was still evaluating borrowers' Complete Applications that it had received on or after January 10, 2014 and more than 37 days before a foreclosure sale.

307.    In numerous instances, Ocwen has obtained foreclosure judgments and/or conducted foreclosure sales upon the homes of borrowers from whom it received a Complete Application or Facially Complete Application on or after January 10, 2014 and more than 37 days before a foreclosure sale, and who: (1) were waiting for Ocwen to evaluate their Complete Application; (2) still had time to accept a loss mitigation offer; (3) were performing upon a loss mitigation agreement; or (4) had not been provided with a reasonable opportunity to provide Ocwen with missing information or corrected information required to complete a Facially Complete Application.

308.    The acts and practices described in Paragraphs 305-306 constitute violations of Sections 6(j)(3), 6(k)(1)(C), 6(k)(1)(E) and 19(a) of RESPA, 12 U.S.C. §§ 2605(j)(3), (k)(1)(C), and (k)(1)(E), and 12 U.S.C. § 2617(a), and Regulation X, 12 C.F.R.

# Exhibit A

§§ 1024.41(b)(2)(i)(B), 1024.41(c)(1)(i) and (ii), 1024.41(f)(2), and 1024.41(g) , and §

1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## <u>VIOLATIONS OF THE HOMEOWNERS PROTECTION ACT</u>

309.    Under the Homeowners Protection Act (HPA), servicers are required,

under certain conditions, to automatically terminate a mortgagee's requirement to pay

private mortgage insurance on a certain date called the "termination date." 12 U.S.C. §

4902(b).

310.    A "servicer" as defined by the HPA, 12 U.S.C. § 4901(16), means a servicer

as defined in RESPA, 12 U.S.C. § 2605(i)(2). As referenced in Paragraphs 13, 16, and 17,

Ocwen is a servicer.

311.    A "mortgagor" as defined by the HPA, 12 U.S.C. § 4901(11), means the

"original borrower under a residential mortgage or his or her successors or assignees."

312.    A "residential mortgage" as defined by the HPA, 12 U.S.C. § 4901(14),

means a "mortgage loan, or other evidence of a security interest with respect to a single-

family dwelling that is the principal residence of the mortgagor."

313.    "Private mortgage insurance" as defined by the HPA, 12 U.S.C. § 4901(10),

means "mortgage insurance other than mortgage insurance made available under the

National Housing Act, 12 U.S.C. § 1701, title 38, or title V of the Housing Act of 1949, 42

U.S.C. 1471 et seq."

314.    The "termination date" as defined by the HPA, 12 U.S.C. § 4901(18),

means the date when:

> a.   With respect to a fixed rate mortgage, the date on which the
>
> principal balance of the mortgage, based solely on the initial
>
> amortization schedule for that mortgage, and irrespective of the

# Exhibit A

outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan; and

b.  With respect to an adjustable rate mortgage, the date on which the principal balance of the mortgage, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan.

## COUNT XIV
### Ocwen's Violations of the HPA

315.    The Bureau incorporates by reference the allegations of Paragraphs 1-220.

316.    Ocwen is the servicer for mortgagors or the original borrowers under a residential mortgage with respect to single-family dwellings that are their principal residences.

317.    In numerous instances since January 2014, Ocwen has failed to automatically terminate private mortgage insurance for borrowers who were current or became current on their mortgage as of their termination date.

318.    The acts and practices described in Paragraph 316 constitute violations of Section 4901(b) of the HPA, 12 U.S.C. § 4901(b) , and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

## Prayer for Relief

Wherefore, the Bureau, pursuant to Sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, and the Court's own equitable powers, requests that the Court:

# Exhibit A

1. Permanently enjoin Defendants from committing future violations of the CFPA, FDCPA, RESPA, TILA, and HPA, and enter such other injunctive relief as appropriate, including ordering that, if any Defendant is found to be in material non-compliance with any injunction entered by the Court, the Defendant must claw back any non-salary bonuses or other compensation it has paid, or stock option it has granted, to any officer or director of the Defendant in connection with the time period during which the Defendant was not in compliance;

2. Award such relief as the Court finds necessary to redress injury to consumers, including, but not limited to, rescission or reform of contracts; refund of moneys; restitution; and payment of damages or other monetary relief;

3. Award such relief as the Court finds necessary to disgorge the Defendants of unlawful gains;

4. Impose civil money penalties against the Defendants;

5. Order the Defendants to pay costs and fees incurred in prosecuting this action; and

6. Award additional relief as the Court may deem just and proper.

# Exhibit A

Dated: April 20, 2017

Respectfully submitted,

Attorneys for Plaintiff
Consumer Financial Protection Bureau

ANTHONY ALEXIS
Enforcement Director

CARA PETERSEN
Deputy Enforcement Director
For Litigation

GABRIEL O'MALLEY
Assistant Litigation Deputy

/s/ Jean Healey
Jean Healey
E-mail: jean.healey@cfpb.gov
Phone: 202-435-7514
Facsimile: (202) 435-7722
1700 G Street NW
Washington, DC 20552

Jan Singelmann
E-mail: jan.singelmann@cfpb.gov
Phone: 202-435-9670
Facsimile: (202) 435-7722
1700 G Street NW
Washington, DC 20552

Atur Desai
E-mail: atur.desai@cfpb.gov
Phone: 202-435-7978
Facsimile: (202) 435-7722
1700 G Street NW
Washington, DC 20552

# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| KAREN A. CARVELLI, Individually and On Behalf of All Others Similarly Situated, | ) ) **Case No.** |
| Plaintiff, | ) ) |
| v. | ) **CLASS ACTION COMPLAINT** |
| | ) |
| OCWEN FINANCIAL CORPORATION, RONALD M. FARIS, and MICHAEL R. BOURQUE JR., | ) **JURY TRIAL DEMANDED** ) ) |
| Defendants. | ) |

## CLASS ACTION COMPLAINT

Plaintiff Karen A. Carvelli ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ocwen Financial Corporation ("Ocwen" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

# Exhibit B

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons

other than defendants who purchased or otherwise acquired Ocwen securities between May 11,

2015 and April 19, 2017, both dates inclusive (the "Class Period"), seeking to recover damages

caused by defendants' violations of the federal securities laws and to pursue remedies under

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule

10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Ocwen Financial Corporation is diversified financial services holding company.

The Company's primary businesses are the acquisition, servicing, and resolution of sub-performing

and nonperforming residential and commercial mortgage loans, as well as the related development

of loan servicing technology and business-to business e-commerce solutions for the mortgage and

real estate industries.

3.      Founded in 1988, the Company is headquartered in West Palm Beach, Florida.

Ocwen's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol

"OCN."

4.      Throughout the Class Period, Defendants made materially false and misleading

statements regarding the Company's business, operational and compliance policies. Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) Ocwen

engaged in significant and systemic misconduct at nearly every stage of the mortgage servicing

process; (ii) the foregoing conduct, when it became known would subject the Company to

heightened regulatory scrutiny and potential criminal sanctions; (iii) as a result of the foregoing,

Ocwen's public statements were materially false and misleading at all relevant times.

5.      On April 20, 2017, the U.S. Consumer Financial Protection Bureau ("CFPB")

issued a press release entitled "Consumer Financial Protection Bureau sues Ocwen for failing

# Exhibit B

borrowers throughout mortgage servicing process," reporting that the Company had generated

errors in borrowers' accounts, failed to credit payments, illegally foreclosed on homeowners, and

charged borrowers for add-on products without their consent. The press release, in part:

> **WASHINGTON, D.C.** — The Consumer Financial Protection Bureau (CFPB) today sued one of the country's largest nonbank mortgage loan servicers, Ocwen Financial Corporation, and its subsidiaries for failing borrowers at every stage of the mortgage servicing process. *The Bureau alleges that Ocwen's years of widespread errors, shortcuts, and runarounds cost some borrowers money and others their homes. Ocwen allegedly botched basic functions like sending accurate monthly statements, properly crediting payments, and handling taxes and insurance. Allegedly, Ocwen also illegally foreclosed on struggling borrowers, ignored customer complaints, and sold off the servicing rights to loans without fully disclosing the mistakes it made in borrowers' records.* The Florida Attorney General took a similar action against Ocwen today in a separate lawsuit. Many state financial regulators are also independently issuing cease-and-desist and license revocation orders against Ocwen for escrow management and licensing issues today.

> "Ocwen has repeatedly made mistakes and taken shortcuts at every stage of the mortgage servicing process, costing some consumers money and others their homes," said CFPB Director Richard Cordray. "Borrowers have no say over who services their mortgage, so the Bureau will remain vigilant to ensure they get fair treatment."

> Ocwen, headquartered in West Palm Beach, Fla., is one of the nation's largest nonbank mortgage servicers. As of Dec. 31, 2016, Ocwen serviced almost 1.4 million loans with an aggregate unpaid principal balance of $209 billion. It services loans for borrowers in all 50 states and the District of Columbia. A mortgage servicer collects payments from the mortgage borrower and forwards those payments to the owner of the loan. It handles customer service, collections, loan modifications, and foreclosures. Ocwen specializes in servicing subprime or delinquent loans.

> *The CFPB uncovered substantial evidence that Ocwen has engaged in significant and systemic misconduct at nearly every stage of the mortgage servicing process.* The CFPB is charged with enforcing the Dodd-Frank Wall Street Reform and Consumer Protection Act, which protects consumers from unfair, deceptive, or abusive acts or practices, and other federal consumer financial laws. In addition, the Bureau adopted common-sense rules for the mortgage servicing market that first took effect in January 2014. The CFPB's mortgage servicing rules require that servicers promptly credit payments and correct errors on request. The rules also include strong protections for struggling homeowners, including those facing foreclosure. In its lawsuit, the CFPB alleges that Ocwen:

3

# Exhibit B

- **Serviced loans using error-riddled information**: Ocwen uses a proprietary system called REALServicing to process and apply borrower payments, communicate payment information to borrowers, and maintain loan balance information. Ocwen allegedly loaded inaccurate and incomplete information into its REALServicing system. And even when data was accurate, REALServicing generated errors because of system failures and deficient programming. To manage this risk, Ocwen tried manual workarounds, but *they often failed to correct inaccuracies and produced still more errors. Ocwen then used this faulty information to service borrowers' loans. In 2014, Ocwen's head of servicing described its system as "ridiculous" and a "train wreck."*

- **Illegally foreclosed on homeowners**: Ocwen has long touted its ability to service and modify loans for troubled borrowers. But allegedly, Ocwen has failed to deliver required foreclosure protections. As a result, the Bureau alleges that *Ocwen has wrongfully initiated foreclosure proceedings on at least 1,000 people, and has wrongfully held foreclosure sales. Among other illegal practices, Ocwen has initiated the foreclosure process before completing a review of borrowers' loss mitigation applications.* In other instances, Ocwen has asked borrowers to submit additional information within 30 days, but foreclosed on the borrowers before the deadline. Ocwen has also foreclosed on borrowers who were fulfilling their obligations under a loss mitigation agreement.

- **Failed to credit borrowers' payments**: Ocwen has allegedly failed to appropriately credit payments made by numerous borrowers. Ocwen has also failed to send borrowers accurate periodic statements detailing the amount due, how payments were applied, total payments received, and other information. Ocwen has also failed to correct billing and payment errors.

- **Botched escrow accounts**: Ocwen manages escrow accounts for over 75 percent of the loans it services. Ocwen has allegedly botched basic tasks in managing these borrower accounts. Because of system breakdowns and an over-reliance on manually entering information, Ocwen has allegedly failed to conduct escrow analyses and sent some borrowers' escrow statements late or not at all. Ocwen also allegedly failed to properly account for and apply payments by borrowers to address escrow shortages, such as changes in the account when property taxes go up. One result of this failure has been that some borrowers have paid inaccurate amounts.

- **Mishandled hazard insurance**: If a servicer administers an escrow account for a borrower, a servicer must make timely insurance and/or tax payments on behalf of the borrower. Ocwen, however, has allegedly failed to make timely insurance payments to pay for borrowers' home insurance premiums. Ocwen's failures led to the lapse of homeowners' insurance

4

# Exhibit B

coverage for more than 10,000 borrowers. Some borrowers were pushed into force-placed insurance.

- **Bungled borrowers' private mortgage insurance:** Ocwen allegedly failed to cancel borrowers' private mortgage insurance, or PMI, in a timely way, causing consumers to overpay. Generally, borrowers must purchase PMI when they obtain a mortgage with a down payment of less than 20 percent, or when they refinance their mortgage with less than 20 percent equity in their property. Servicers must end a borrower's requirement to pay PMI when the principal balance of the mortgage reaches 78 percent of the property's original value. Since 2014, Ocwen has failed to end borrowers' PMI on time after learning information in its REALServicing system was unreliable or missing altogether. Ocwen ultimately overcharged borrowers about $1.2 million for PMI premiums, and refunded this money only after the fact.

- **Deceptively signed up and charged borrowers for add-on products:** When servicing borrowers' mortgage loans, Ocwen allegedly enrolled some consumers in add-on products through deceptive solicitations and without their consent. Ocwen then billed and collected payments from these consumers.

- **Failed to assist heirs seeking foreclosure alternatives:** Ocwen allegedly mishandled accounts for successors-in-interest, or heirs, to a deceased borrower. These consumers included widows, children, and other relatives. As a result, Ocwen failed to properly recognize individuals as heirs, and thereby denied assistance to help avoid foreclosure. In some instances, Ocwen foreclosed on individuals who may have been eligible to save these homes through a loan modification or other loss mitigation option.

- **Failed to adequately investigate and respond to borrower complaints:** If an error is made in the servicing of a mortgage loan, a servicer must generally either correct the error identified by the borrower, called a notice of error, or investigate the alleged error. Since 2014, Ocwen has allegedly routinely failed to properly acknowledge and investigate complaints, or make necessary corrections. Ocwen changed its policy in April 2015 to address the difficulty its call center had in recognizing and escalating complaints, but these changes fell short. Under its new policy, borrowers still have to complain at least five times in nine days before Ocwen automatically escalates their complaint to be resolved. Since April 2015, Ocwen has received more than 580,000 notices of error and complaints from more than 300,000 different borrowers.

- **Failed to provide complete and accurate loan information to new servicers:** Ocwen has allegedly failed to include complete and accurate borrower information when it sold its rights to service thousands of loans to

5

# Exhibit B

new mortgage servicers. This has hampered the new servicers' efforts to comply with laws and investor guidelines.

*The Bureau also alleges that Ocwen has failed to remediate borrowers for the harm it has caused, including the problems it has created for struggling borrowers who were in default on their loans or who had filed for bankruptcy.* For these groups of borrowers, Ocwen's servicing errors have been particularly costly.

(Emphasis added.)

6.     On that same day, it was further reported that the North Carolina Office of the Commissioner of Banks and state regulators from more than twenty states issued a cease-and-desist order (the "Order") to Ocwen's subsidiaries as a result of the Company's mishandling of consumer escrow accounts and a deficient financial condition.  The Order "specifically prohibits the acquisition of new mortgage servicing rights and the origination of mortgage loans by Ocwen Loan Servicing (NMLS number 1852), a subsidiary of Ocwen, until the company is able to prove it can appropriately manage its consumer mortgage escrow accounts."

7.     On this news, Ocwen's share price fell $2.91, or 53.89%, to close at $2.49 on April 20, 2017.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

6

# Exhibit B

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Ocwen's principal executive offices are located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired Ocwen securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Ocwen is incorporated in Florida.  The Company's principal executive offices are located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409. Ocwen's shares trade on the NYSE under the ticker symbol "OCN."

15.     Defendant Ronald M. Farris ("Farris") has served as the Company's Chief Executive Officer ("CEO") since October 2010, as its President since March 2001 and as its Director since May 2003.

16.     Defendant Michael R. Bourque Jr. ("Bourque") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since June 2014.

17.     The defendants referenced above in ¶¶ 15-16 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

7

# Exhibit B

18.     Ocwen Financial Corporation is diversified financial services holding company. The Company's primary businesses are the acquisition, servicing, and resolution of sub-performing and nonperforming residential and commercial mortgage loans, as well as the related development of loan servicing technology and business-to business e-commerce solutions for the mortgage and real estate industries.

## Materially False and Misleading Statements Issued During the Class Period

19.     The Class Period begins on May 11, 2015, when Ocwen filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"). For the quarter, Ocwen reported a net loss of $598.37 million, or $4.77 per diluted share, on net revenue of $366.18 million, compared to net income of $135.28 million, or $0.95 per diluted share, on net revenue of $488.83 million for the same period in the prior year. For 2014, Ocwen reported a net loss of $469.80 million, or $3.60 per diluted share, on net revenue of $1.59 billion, compared to net income of $310.42 million, or $2.13 per diluted share, on net revenue of $1.65 billion for 2013.

20.     In the 2014 10-K, the Company stated, in part:

> Our business is subject to extensive regulation by federal, state and local governmental authorities, including the Consumer Financial Protection Bureau (CFPB), the Department of Housing and Urban Development (HUD), the Securities and Exchange Commission (SEC) and various state agencies that license, audit and conduct examinations of our mortgage servicing, origination and collection activities. In addition, we operate under a number of regulatory settlements that subject us to ongoing monitoring or reporting. From time to time, we also receive requests from federal, state and local agencies for records, documents and information relating to the policies, procedures and practices of our mortgage servicing, origination and collection activities. The GSEs and their conservator, the Federal Housing Finance Authority (FHFA), Ginnie Mae, the United States Treasury Department, various investors, non-Agency securitization trustees and others also subject us to periodic reviews and audits.

> As a result of the current regulatory environment, we have faced and expect to continue to face increased regulatory and public scrutiny as well as stricter and more comprehensive regulation of our business. ***We continue to work diligently to***

8

# Exhibit B

*assess and understand the implications of the regulatory environment in which we operate and to meet the requirements of the changing environment in which we operate. We devote substantial resources to regulatory compliance, while, at the same time, striving to meet the needs and expectations of our customers, clients and other stakeholders.* Our failure to comply with applicable federal, state and local laws, regulations and licensing requirements could lead to any of the following: (i) loss of our licenses and approvals to engage in our servicing and lending businesses, (ii) governmental investigations and enforcement actions, (iii) administrative fines and penalties and litigation, (iv) civil and criminal liability, including class action lawsuits, (v) breaches of covenants and representations under our servicing, debt or other agreements, (vi) inability to raise capital or (vii) inability to execute on our business strategy.

We must comply with a large number of federal, state and local consumer protection laws including, among others, the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act, the Real Estate Settlement Procedures Act (RESPA), the Truth in Lending Act (TILA), the Fair Credit Reporting Act, the Service members Civil Relief Act, the Homeowners Protection Act, the Federal Trade Commission Act, the Equal Credit Opportunity Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) and state foreclosure laws. These statutes apply to loan origination, debt collection, use of credit reports, safeguarding of non-public personally identifiable information about our customers, foreclosure and claims handling, investment of and interest payments on escrow balances and escrow payment features, and mandate certain disclosures and notices to borrowers. These requirements can and do change as statutes and regulations are enacted, promulgated, amended, interpreted and enforced. The recent trend among federal, state and local lawmakers and regulators has been toward increasing laws, regulations and investigative proceedings with regard to residential real estate lenders and servicers.

(Emphasis added.)

21.     The 2014 10-K contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

22.     On May 18, 2015, Ocwen filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, Ocwen reported net income of $34.36 million, or $0.27

9

# Exhibit B

per diluted share, on net revenue of $423.03 million, compared to net income of $60.5 million, or

$0.43 per diluted share, on net revenue of $420.9 million for the same period in the prior year.

23.    The Q1 2015 10-Q contained signed certifications pursuant to SOX by the

Individual Defendants, stating that the financial information contained in the Q1 2015 10-Q was

accurate and disclosed any material changes to the Company's internal controls over financial

reporting.

24.    On July 31, 2015, Ocwen filed a Quarterly Report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the

"Q2 2015 10-Q").   For the quarter, Ocwen reported net income of $9.74 million, or $0.08 per

diluted share, on net revenue of $373.70 million, compared to net income of $66.96 million, or

$0.48 per diluted share, on net revenue of $422.64 million for the same period in the prior year.

25.    The Q2 2015 10-Q contained signed certifications pursuant to SOX by the

Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was

accurate and disclosed any material changes to the Company's internal controls over financial

reporting.

26.    On October 29, 2015, Ocwen filed a Quarterly Report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended September 30,

2015 (the "Q3 2015 10-Q").   For the quarter, Ocwen reported a net loss of $66.87 million, or $0.53

per diluted share, on net revenue of $333.57 million, compared to a net loss of $75.38 million, or

$0.58 per diluted share, on net revenue of $382.77 million for the same period in the prior year.

27.    The Q3 2015 10-Q contained signed certifications pursuant to SOX by the

Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was

# Exhibit B

accurate and disclosed any material changes to the Company's internal controls over financial reporting.

28.    On February 29, 2016, Ocwen filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K"). For the quarter, Ocwen reported a net loss of $224.24 million, or $1.79 per diluted share, on net revenue of $230.67 million, compared to a net loss of $598.37 million, or $4.77 per diluted share, on net revenue of $366.18 million for the same period in the prior year. For 2015, Ocwen reported a net loss of $247.02 million, or $1.97 per diluted share, on net revenue of $1.36 billion, compared a net loss of $469.80 million, or $3.60 per diluted share, on net revenue of $1.59 billion for 2014.

29.    In the 2015 10-K, the Company stated, in part:

Our business is subject to extensive regulation by federal, state and local governmental authorities, including the Consumer Financial Protection Bureau (CFPB), the Department of Housing and Urban Development (HUD), the Securities and Exchange Commission (SEC) and various state agencies that license, audit and conduct examinations of our loan servicing, origination and collection activities. In addition, we operate under a number of regulatory settlements that subject us to ongoing monitoring or reporting. From time to time, we also receive requests from federal, state and local agencies for records, documents and information relating to the policies, procedures and practices of our loan servicing, origination and collection activities. The GSEs and their conservator, the Federal Housing Finance Authority (FHFA), Ginnie Mae, the United States Treasury Department, various investors, non-Agency securitization trustees and others also subject us to periodic reviews and audits.

In the current regulatory environment, we have faced and expect to continue to face increased regulatory and public scrutiny as an organization as well as stricter and more comprehensive regulation of the entire mortgage sector. *We continue to work diligently to assess and understand the implications of the regulatory environment in which we operate and to meet the requirements of the changing environment in which we operate. We devote substantial resources to regulatory compliance, while, at the same time, striving to meet the needs and expectations of our customers, clients and other stakeholders.* Our failure to comply with applicable federal, state and local laws, regulations and licensing requirements could lead to any of the following (i) loss of our licenses and approvals to engage in our servicing and lending businesses, (ii) governmental investigations and

11

# Exhibit B

enforcement actions, (iii) administrative fines and penalties and litigation, (iv) civil and criminal liability, including class action lawsuits, (v) breaches of covenants and representations under our servicing, debt or other agreements, (vi) inability to raise capital or (vii) inability to execute on our business strategy.

We must comply with a large number of federal, state and local consumer protection laws including, among others, the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act, the Real Estate Settlement Procedures Act (RESPA), the Truth in Lending Act (TILA), the Fair Credit Reporting Act, the Servicemembers Civil Relief Act, the Homeowners Protection Act, the Federal Trade Commission Act, the Telephone Consumer Protection Act, the Equal Credit Opportunity Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act and state foreclosure laws. These statutes apply to many facets of our business, including loan origination, default servicing and collections, use of credit reports, safeguarding of non-public personally identifiable information about our customers, foreclosure and claims handling, investment of and interest payments on escrow balances and escrow payment features, and mandate certain disclosures and notices to borrowers. These requirements can and do change as statutes and regulations are enacted, promulgated, amended, interpreted and enforced. The recent trend among federal, state and local lawmakers and regulators has been toward increasing laws, regulations and investigative proceedings with regard to residential real estate lenders and servicers.

(Emphasis added.)

30.   The 2015 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

31.   On April 28, 2016, Ocwen filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). For the quarter, Ocwen reported a net loss of $111.33 million, or $0.90 per diluted share, on net revenue of $230.03 million, compared to net income of $34.36 million, or $0.27 per diluted share, on net revenue of $423.03 million for the same period in the prior year.

32.   The Q1 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2016 10-Q was

# Exhibit B

accurate and disclosed any material changes to the Company's internal controls over financial reporting.

33.    On July 28, 2016, Ocwen filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q"). For the quarter, Ocwen reported a net loss of $87.38 million, or $0.71 per diluted share, on net revenue of $288.01 million, compared to net income of $9.74 million, or $0.08 per diluted share, on net revenue of $373.70 million for the same period in the prior year.

34.    The Q2 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

35.    On October 27, 2016, Ocwen filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q"). For the quarter, Ocwen reported net income of $9.39 million, or $0.08 per diluted share, on net revenue of $259.31 million, compared to a net loss of $66.87 million, or $0.53 per diluted share, on net revenue of $333.57 million for the same period in the prior year.

36.    The Q3 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

37.    On February 17, 2017, Ocwen issued a press release entitled "Ocwen enters into comprehensive settlement with California Department Of Business Oversight," announcing a

13

# Exhibit B

comprehensive settlement with the State of California in connection with allegations on non-

compliance with state laws, brought in 2015 after Ocwen failed to turn over documents and an

auditor "found Ocwen committed hundreds of violations of state and federal laws and regulations."

In the press release, the Company stated, in part:

> WEST PALM BEACH, Fla., Feb. 17, 2017 (GLOBE NEWSWIRE) -- Ocwen
> Financial Corporation (NYSE:OCN) (Ocwen or the Company) today announced a
> comprehensive settlement and termination of the January 2015 Consent Order
> between Ocwen Loan Servicing, LLC and the State of California Department of
> Business Oversight (DBO), without admitting any wrongdoing.
>
> Under this settlement, the DBO will lift its prior restriction on Ocwen's ability to
> acquire mortgage servicing rights associated with California properties, and will
> terminate the engagement of the independent auditor, which has been in place
> under the prior Consent Order in California.
>
> In addition, Ocwen has agreed to pay a cash settlement of $25 million to the DBO.
> As previously communicated, the Company has reserved for this settlement as of
> September 30, 2016. Ocwen will also provide an additional $198 million in debt
> forgiveness through loan modifications to existing California borrowers over a
> three year period, as permitted under various servicing agreements.
>
> "Ocwen is pleased to have reached a comprehensive settlement with the DBO
> related to matters the agency raised, and we will quickly move forward to
> implement all terms associated with this agreement," commented Ron Faris,
> President and CEO of Ocwen. "The settlement resolves claims between Ocwen and
> the DBO without the Company admitting to any wrongdoing, and will allow us to
> focus on our business going forward, while reducing a significant expense by
> terminating the engagement of the independent auditor."

38.     On February 23, 2017, Ocwen filed an Annual Report on Form 10-K with the SEC,

announcing the Company's financial and operating results for the quarter and year ended

December 31, 2016 (the "2016 10-K"). For the quarter, Ocwen reported a net loss of $10.44

million, or $0.08 per diluted share, on net revenue of $224.80 million, compared to a net loss of

$224.24 million, or $1.79 per diluted share, on net revenue of $230.67 million for the same period

in the prior year. For 2016, Ocwen reported a net loss of $199.76 million, or $1.61 per diluted

# Exhibit B

share, on net revenue of $1 billion, compared to a net loss of $247.02 million, or $1.97 per diluted

share, on net revenue of $1.36 billion for 2015.

> 39.     In the 2016 10-K, the Company stated, in part:

> Our business is subject to extensive oversight and regulation by federal, state and local governmental authorities, including the CFPB, HUD, the SEC and various state agencies that license, audit and conduct examinations of our loan servicing, origination and collection activities. From time to time, we also receive requests (including requests in the form of subpoenas and civil investigative demands) from federal, state and local agencies for records, documents and information relating to the policies, procedures and practices of our loan servicing, origination and collection activities. In addition, we operate under a number of regulatory settlements that subject us to ongoing monitoring or reporting. See the next risk factor below for examples of matters we settled in 2014 and 2015, respectively, with the State of New York and the State of California. The GSEs (and their conservator, the FHFA), Ginnie Mae, the United States Treasury Department, various investors, non-Agency securitization trustees and others also subject us to periodic reviews and audits.

> In the current regulatory environment, we have faced and expect to continue to face heightened regulatory and public scrutiny as an organization as well as stricter and more comprehensive regulation of the entire mortgage sector. *We must devote substantial resources to regulatory compliance, and we incur, and expect to continue to incur, significant ongoing costs to comply with new and existing laws and governmental regulation of our business.* If we fail to effectively manage our regulatory and contractual compliance obligations, the resources we are required to devote and our compliance expenses would likely increase.

> We must comply with a large number of federal, state and local consumer protection laws including, among others, the Dodd-Frank Act, the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act, RESPA, TILA, the Fair Credit Reporting Act, the Service members Civil Relief Act, the Homeowners Protection Act, the Federal Trade Commission Act, the Telephone Consumer Protection Act, the Equal Credit Opportunity Act, as well as individual state licensing and foreclosure laws and federal and local bankruptcy rules. These statutes apply to many facets of our business, including loan origination, default servicing and collections, use of credit reports, safeguarding of non-public personally identifiable information about our customers, foreclosure and claims handling, investment of and interest payments on escrow balances and escrow payment features, and mandate certain disclosures and notices to borrowers. These requirements can and do change as statutes and regulations are enacted, promulgated, amended, interpreted and enforced. See "Business - Regulation" for additional information regarding our regulators and the laws that apply to us.

> (Emphasis added.)

15

# Exhibit B

40.     The 2016 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

41.     The statements referenced in ¶¶ 19-36 and 38-40 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Ocwen engaged in significant and systemic misconduct at nearly every stage of the mortgage servicing process; (ii) the foregoing conduct, when it became known would subject the Company to heightened regulatory scrutiny and potential criminal sanctions; (iii) as a result of the foregoing, Ocwen's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

42.     On April 20, 2017, the CFPB issued a press release entitled "Consumer Financial Protection Bureau sues Ocwen for failing borrowers throughout mortgage servicing process," reporting that the Company had generated errors in borrowers' accounts, failed to credit payments, illegally foreclosed on homeowners, and charged borrowers for add-on products without their consent. The press release, in part:

> **WASHINGTON, D.C.** — The Consumer Financial Protection Bureau (CFPB) today sued one of the country's largest nonbank mortgage loan servicers, Ocwen Financial Corporation, and its subsidiaries for failing borrowers at every stage of the mortgage servicing process. *The Bureau alleges that Ocwen's years of widespread errors, shortcuts, and runarounds cost some borrowers money and others their homes. Ocwen allegedly botched basic functions like sending accurate monthly statements, properly crediting payments, and handling taxes and insurance. Allegedly, Ocwen also illegally foreclosed on struggling borrowers, ignored customer complaints, and sold off the servicing rights to loans without fully disclosing the mistakes it made in borrowers' records.* The Florida Attorney General took a similar action against Ocwen today in a separate lawsuit. Many state financial regulators are also independently issuing cease-and-desist and

16

# Exhibit B

license revocation orders against Ocwen for escrow management and licensing issues today.

"Ocwen has repeatedly made mistakes and taken shortcuts at every stage of the mortgage servicing process, costing some consumers money and others their homes," said CFPB Director Richard Cordray. "Borrowers have no say over who services their mortgage, so the Bureau will remain vigilant to ensure they get fair treatment."

Ocwen, headquartered in West Palm Beach, Fla., is one of the nation's largest nonbank mortgage servicers. As of Dec. 31, 2016, Ocwen serviced almost 1.4 million loans with an aggregate unpaid principal balance of $209 billion. It services loans for borrowers in all 50 states and the District of Columbia. A mortgage servicer collects payments from the mortgage borrower and forwards those payments to the owner of the loan. It handles customer service, collections, loan modifications, and foreclosures. Ocwen specializes in servicing subprime or delinquent loans.

*The CFPB uncovered substantial evidence that Ocwen has engaged in significant and systemic misconduct at nearly every stage of the mortgage servicing process.* The CFPB is charged with enforcing the Dodd-Frank Wall Street Reform and Consumer Protection Act, which protects consumers from unfair, deceptive, or abusive acts or practices, and other federal consumer financial laws. In addition, the Bureau adopted common-sense rules for the mortgage servicing market that first took effect in January 2014. The CFPB's mortgage servicing rules require that servicers promptly credit payments and correct errors on request. The rules also include strong protections for struggling homeowners, including those facing foreclosure. In its lawsuit, the CFPB alleges that Ocwen:

- **Serviced loans using error-riddled information**: Ocwen uses a proprietary system called REALServicing to process and apply borrower payments, communicate payment information to borrowers, and maintain loan balance information. Ocwen allegedly loaded inaccurate and incomplete information into its REALServicing system. And even when data was accurate, REALServicing generated errors because of system failures and deficient programming. To manage this risk, Ocwen tried manual workarounds, but *they often failed to correct inaccuracies and produced still more errors. Ocwen then used this faulty information to service borrowers' loans. In 2014, Ocwen's head of servicing described its system as "ridiculous" and a "train wreck."*

- **Illegally foreclosed on homeowners**: Ocwen has long touted its ability to service and modify loans for troubled borrowers. But allegedly, Ocwen has failed to deliver required foreclosure protections. As a result, the Bureau alleges that *Ocwen has wrongfully initiated foreclosure proceedings on at least 1,000 people, and has wrongfully held foreclosure sales. Among other illegal practices, Ocwen has initiated the foreclosure process before*

17

# Exhibit B

*completing a review of borrowers' loss mitigation applications.* In other instances, Ocwen has asked borrowers to submit additional information within 30 days, but foreclosed on the borrowers before the deadline. Ocwen has also foreclosed on borrowers who were fulfilling their obligations under a loss mitigation agreement.

▪ **Failed to credit borrowers' payments:** Ocwen has allegedly failed to appropriately credit payments made by numerous borrowers. Ocwen has also failed to send borrowers accurate periodic statements detailing the amount due, how payments were applied, total payments received, and other information. Ocwen has also failed to correct billing and payment errors.

▪ **Botched escrow accounts:** Ocwen manages escrow accounts for over 75 percent of the loans it services. Ocwen has allegedly botched basic tasks in managing these borrower accounts. Because of system breakdowns and an over-reliance on manually entering information, Ocwen has allegedly failed to conduct escrow analyses and sent some borrowers' escrow statements late or not at all. Ocwen also allegedly failed to properly account for and apply payments by borrowers to address escrow shortages, such as changes in the account when property taxes go up. One result of this failure has been that some borrowers have paid inaccurate amounts.

▪ **Mishandled hazard insurance:** If a servicer administers an escrow account for a borrower, a servicer must make timely insurance and/or tax payments on behalf of the borrower. Ocwen, however, has allegedly failed to make timely insurance payments to pay for borrowers' home insurance premiums. Ocwen's failures led to the lapse of homeowners' insurance coverage for more than 10,000 borrowers. Some borrowers were pushed into force-placed insurance.

▪ **Bungled borrowers' private mortgage insurance:** Ocwen allegedly failed to cancel borrowers' private mortgage insurance, or PMI, in a timely way, causing consumers to overpay. Generally, borrowers must purchase PMI when they obtain a mortgage with a down payment of less than 20 percent, or when they refinance their mortgage with less than 20 percent equity in their property. Servicers must end a borrower's requirement to pay PMI when the principal balance of the mortgage reaches 78 percent of the property's original value. Since 2014, Ocwen has failed to end borrowers' PMI on time after learning information in its REALServicing system was unreliable or missing altogether. Ocwen ultimately overcharged borrowers about $1.2 million for PMI premiums, and refunded this money only after the fact.

▪ **Deceptively signed up and charged borrowers for add-on products:** When servicing borrowers' mortgage loans, Ocwen allegedly enrolled some consumers in add-on products through deceptive solicitations and without

18

# Exhibit B

their consent. Ocwen then billed and collected payments from these consumers.

- **Failed to assist heirs seeking foreclosure alternatives:** Ocwen allegedly mishandled accounts for successors-in-interest, or heirs, to a deceased borrower. These consumers included widows, children, and other relatives. As a result, Ocwen failed to properly recognize individuals as heirs, and thereby denied assistance to help avoid foreclosure. In some instances, Ocwen foreclosed on individuals who may have been eligible to save these homes through a loan modification or other loss mitigation option.

- **Failed to adequately investigate and respond to borrower complaints:** If an error is made in the servicing of a mortgage loan, a servicer must generally either correct the error identified by the borrower, called a notice of error, or investigate the alleged error. Since 2014, Ocwen has allegedly routinely failed to properly acknowledge and investigate complaints, or make necessary corrections. Ocwen changed its policy in April 2015 to address the difficulty its call center had in recognizing and escalating complaints, but these changes fell short. Under its new policy, borrowers still have to complain at least five times in nine days before Ocwen automatically escalates their complaint to be resolved. Since April 2015, Ocwen has received more than 580,000 notices of error and complaints from more than 300,000 different borrowers.

- **Failed to provide complete and accurate loan information to new servicers:** Ocwen has allegedly failed to include complete and accurate borrower information when it sold its rights to service thousands of loans to new mortgage servicers. This has hampered the new servicers' efforts to comply with laws and investor guidelines.

*The Bureau also alleges that Ocwen has failed to remediate borrowers for the harm it has caused, including the problems it has created for struggling borrowers who were in default on their loans or who had filed for bankruptcy.* For these groups of borrowers, Ocwen's servicing errors have been particularly costly.

(Emphasis added.)

43.     On that same day, it was further reported that the North Carolina Office of the

Commissioner of Banks and state regulators from more than twenty states issued a cease-and-

desist order (the "Order") to Ocwen's subsidiaries as a result of the Company's mishandling of

consumer escrow accounts and a deficient financial condition.  The Order "specifically prohibits

the acquisition of new mortgage servicing rights and the origination of mortgage loans by Ocwen

# Exhibit B

Loan Servicing (NMLS number 1852), a subsidiary of Ocwen, until the company is able to prove

it can appropriately manage its consumer mortgage escrow accounts."

     44.    On this news, Ocwen's share price fell $2.91, or 53.89%, to close at $2.49 on April

20, 2017.

     45.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's securities, Plaintiff and other Class members have suffered

significant losses and damages.

<b><u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u></b>

     46.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired Ocwen securities during the Class Period (the "Class"); and were damaged upon the

revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the

officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which defendants have

or had a controlling interest.

     47.    The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, Ocwen securities were actively traded on the NYSE.

While the exact number of Class members is unknown to Plaintiff at this time and can be

ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class.  Record owners and other members of the Class may

be identified from records maintained by Ocwen or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions.

20

# Exhibit B

48.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

49.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ocwen;

- whether the Individual Defendants caused Ocwen to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Ocwen securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

21

# Exhibit B

52.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-

on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Ocwen securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Ocwen securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

53.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a

presumption of reliance upon the integrity of the market.

54.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption

of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in

their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

# Exhibit B

56.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ocwen securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Ocwen securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

58.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ocwen securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ocwen's finances and business prospects.

59.     By virtue of their positions at Ocwen, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

23

# Exhibit B

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants
acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose
such facts as would reveal the materially false and misleading nature of the statements made,
although such facts were readily available to defendants.  Said acts and omissions of defendants
were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew
or recklessly disregarded that material facts were being misrepresented or omitted as described
above.

   60. Information showing that defendants acted knowingly or with reckless disregard
for the truth is peculiarly within defendants' knowledge and control.  As the senior managers
and/or directors of Ocwen, the Individual Defendants had knowledge of the details of Ocwen's
internal affairs.

   61. The Individual Defendants are liable both directly and indirectly for the wrongs
complained of herein.  Because of their positions of control and authority, the Individual
Defendants were able to and did, directly or indirectly, control the content of the statements of
Ocwen.  As officers and/or directors of a publicly-held company, the Individual Defendants had a
duty to disseminate timely, accurate, and truthful information with respect to Ocwen's businesses,
operations, future financial condition and future prospects.  As a result of the dissemination of the
aforementioned false and misleading reports, releases and public statements, the market price of
Ocwen securities was artificially inflated throughout the Class Period.  In ignorance of the adverse
facts concerning Ocwen's business and financial condition which were concealed by defendants,
Plaintiff and the other members of the Class purchased or otherwise acquired Ocwen securities at
artificially inflated prices and relied upon the price of the securities, the integrity of the market for
the securities and/or upon statements disseminated by defendants, and were damaged thereby.

# Exhibit B

62.    During the Class Period, Ocwen securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ocwen securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Ocwen securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Ocwen securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

63.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

65.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

25

# Exhibit B

66.    During the Class Period, the Individual Defendants participated in the operation and management of Ocwen, and conducted and participated, directly and indirectly, in the conduct of Ocwen's business affairs.  Because of their senior positions, they knew the adverse non-public information about Ocwen's misstatement of income and expenses and false financial statements.

67.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ocwen's financial condition and results of operations, and to correct promptly any public statements issued by Ocwen which had become materially false or misleading.

68.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ocwen disseminated in the marketplace during the Class Period concerning Ocwen's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ocwen to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ocwen within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ocwen securities.

69.    Each of the Individual Defendants, therefore, acted as a controlling person of Ocwen.  By reason of their senior management positions and/or being directors of Ocwen, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ocwen to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Ocwen and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

26

# Exhibit B

70.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ocwen.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 21, 2017

Respectfully submitted,

**SHEPHERD, FINKELMAN, MILLER & SHAH LLP**

*/s/ Jayne A. Goldstein*
Jayne A. Goldstein
Florida Bar No. 14408
1625 North Commerce Parkway
Suite 320
Fort Lauderdale, FL 33326
Tel: (954) 515-0123
Fax: (866) 300-7367
jgoldstein@sfmslaw.com

27

# Exhibit B

**POMERANTZ LLP**
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
ahood@pomlaw.com
hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, IL 60603
Tel: (312) 377-1181
Fax: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

# Exhibit C

STATE OF NORTH CAROLINA

WAKE COUNTY

IN A MATTER
BEFORE THE COMMISSIONER OF BANKS

IN THE MATTER OF:                                        Docket No. 17:025:MBB

OCWEN LOAN SERVICING, LLC
NMLS No. 1852
1661 Worthington Rd., Suite 100
West Palm Beach, FL 33409

## CEASE AND DESIST ORDER

The Commissioner of Banks ("Commissioner") having determined that Ocwen Financial
Corporation has engaged in, or is engaging in, or is about to engage in, acts or practices constituting
violations of state and federal law and applicable regulations, hereby issues the following
FINDINGS OF FACT and ORDER TO CEASE AND DESIST.

### A. PARTIES AND JURISDICTION

1.    Ocwen Financial Corporation ("OFC") is a Florida corporation with headquarters
in West Palm Beach, Florida. Ocwen Mortgage Servicing, Inc. ("OMS") is a U.S. Virgin Islands
corporation with headquarters in St. Croix, US Virgin Islands and an assigned NMLS identifier
number of 1089752. Ocwen Loan Servicing, LLC ("OLS") is a Delaware limited liability
company with headquarters located in West Palm Beach, Florida and an assigned NMLS identifier
number of 1852. OLS at all relevant times herein was a wholly-owned subsidiary of OMS, which
was a wholly-owned subsidiary of OFC (collectively referred to herein as "Ocwen").

2.    Ocwen and certain of its subsidiaries are licensed by the Commissioner as a
mortgage loan servicer under the North Carolina Secure and Fair Enforcement Mortgage Licensing
Act ("NC SAFE Act"), Article 19B of Chapter 53 of the North Carolina General Statutes.

1

# Exhibit C

3.     The Commissioner has jurisdiction over the licensing and regulation of persons and entities engaged in the business of residential mortgage loan servicing in North Carolina pursuant to the NC SAFE Act and its implementing rules at 04 NCAC 03M .0101, *et seq.*

4.     The Multi-State Mortgage Committee ("MMC") is a committee of state mortgage regulators who have agreed to address their enforcement concerns with Ocwen in a collective and coordinated manner.  On February 28, 2015, the states of Florida, Maryland, Massachusetts, Mississippi, Montana, and Washington (collectively, the "Examining States") conducted a Multi-State Examination of Ocwen in order to determine Ocwen's compliance with applicable federal and state laws and regulations, financial condition, and control and supervision of the licensed mortgage servicing operations.  The Multi-State Examination of Ocwen covered the period of January 1, 2013 to February 28, 2015.

5.     Pursuant to N.C. Gen. Stat. § 53-244.115, the Commissioner is authorized to inspect the books, accounts, papers, records, and files of mortgage loan servicers, transacting business in North Carolina to determine compliance with the provisions of the NC SAFE Act, and any rule, or regulation issued thereunder, and with any law, rule, or regulation applicable to the conduct of the licensed business.  In addition to the MMC examination, the Commissioner independently examined OLS, and a Report of Examination was issued on November 22, 2016. This examination covered the period of May 17, 2013 to May 17, 2016.

6.     Pursuant to N.C. Gen. Stat. §§ 53C-2-7(d) and 53-244.120, the Commissioner is authorized to enter into written agreements with other government agencies to share confidential information.  In addition, pursuant to N.C. Gen. Stat. § 53-244.115(f), the Commissioner may:

    (2)    Enter into agreements or relationships with other government officials or regulatory associations in order to improve efficiencies and reduce regulatory burden by sharing resources, standardized or uniform methods or procedures, documents, records, information, or evidence obtained under this section[,]; and

# Exhibit C

(4)     Accept and rely on examination or investigation reports made by other government officials, within or without this State.

## B. FINDINGS OF FACT

7.     During the examination, the Examining States identified several violations of state and federal law, including, but not limited to, consumer escrow accounts that could not be reconciled and willful and ongoing unlicensed activity in certain states. Additionally, it was determined that Ocwen's financial condition was significantly deteriorating.

8.     Although the Examining States were unable to gather comprehensive documentation of the extent of unlicensed activity because Ocwen's management failed to respond to requests for information in a timely manner, the examination found that Ocwen subsidiaries were conducting unlicensed servicing activity in numerous jurisdictions. This unlicensed activity was cited in the report of exam. The Examining States had numerous conversations with the Board of OFC in which the Examining States communicated that these continuing violations were unacceptable and would not be tolerated. Although OFC partially addressed the unlicensed activity two years after it was initially cited, unlicensed activity is believed to continue in certain jurisdictions.

9.     The MMC examination found that Ocwen has been unable to accurately reconcile many of the consumer escrow accounts in its portfolio. Consumer escrow accounts are accounts that contain consumer funds held for the payment of taxes and insurance. The MMC examination further found that Ocwen failed to make timely disbursements to pay for taxes and insurance from escrow accounts on numerous loans. The MMC examination also found that Ocwen routinely sent consumers inaccurate, confusing, and/or misleading escrow statements.

3

# Exhibit C

10.    In 2015, Ocwen failed to provide key financial documents and reconcilements of its financial statements to regulators.

11.    Based on the findings of the examination and subsequent communications with OFC, the state regulators and Ocwen entered into a Memorandum of Understanding (MOU) on December 7, 2016.

12.    The MOU required Ocwen to retain an independent auditing firm to perform a comprehensive audit and reconciliation of all consumer escrow accounts, with a report to be furnished by the Auditor to Ocwen and the MMC within five business days thereafter. The audit plan was to be submitted to, and approved by, the MMC no later than January 13, 2017.

13.    Ocwen's response to the state regulators on January 13, 2017, was that the reconciliation of escrow accounts, which is paramount in ensuring the appropriate management of consumer funds, would cost $1.5 billion and be well beyond Ocwen's financial capacity to fund. Ocwen has suggested instead that a sample of 457 escrow accounts be reconciled out of 2.5 million active first lien escrow accounts that Ocwen has serviced since January 2013. This proposal could leave a vast number of consumers with unaudited and inaccurate escrow accounts.

14.    The company is currently facing numerous substantiated consumer complaints regarding escrow accounts that have been mismanaged, resulting in significant harm to consumers, and request for reimbursement of monies wrongfully withheld or misapplied.

15.    The MOU required Ocwen to provide, among other things, a viable going forward business plan that encompassed an analysis of its financial condition going forward. The purpose of the plan was to analyze Ocwen's future financial condition incorporating and encompassing all known or reasonably certain liabilities.

4

# Exhibit C

16.    Ocwen's going forward plan submitted in response to the MOU did not provide a complete assessment of its financial condition because it excluded significant liabilities.  If the going forward plan accurately accounted for known or anticipated regulatory penalties and other operational costs, including, but not limited to, the expenses of moving to a new servicing platform and complete reconciliation of consumer escrow accounts with restitution to impacted borrowers, it would indicate that Ocwen continuing as a going concern would be in doubt.

## C. CONCLUSION OF LAW

17.    Based upon the information contained in Paragraphs 1 through 16, pursuant to N.C. Gen. Stat. § 53-244.114(b)(1), the Commissioner has reason to believe that:

a.    Ocwen has engaged in, is engaging in, or is about to engage in, acts or practices which warrant the belief that the company is not operating honestly, fairly, soundly, and efficiently in the public interest, and /or in violation of standards governing the licensing and conduct of a mortgage loan servicer including, but not limited to, the provisions of N.C. Gen. Stat. § 53-244.060(4), and Ocwen has engaged in, is engaging in, or is about to engage in acts prohibited by N.C. Gen. Stat. § 53-244.111.

b.    The public interest will be irreparably harmed by delay in issuing a cease and desist order to Ocwen.

## CEASE AND DESIST ORDER

**IT IS HEREBY ORDERED** that:

1.    Ocwen shall immediately cease acquiring new mortgage servicing rights, and acquiring or originating new residential mortgages serviced by Ocwen, until Ocwen can show it is a going concern by providing a financial analysis that encompasses all of the liabilities Ocwen currently maintains, as well as liabilities it has knowledge it will incur in the course of its business;

5

# Exhibit C

2.      Ocwen shall immediately cease from acquiring new mortgage servicing rights, and acquiring or originating new residential mortgages serviced by Ocwen, until Ocwen can provide the state regulators with a reconcilement of its escrow accounts showing that consumer funds are appropriately collected, properly calculated, and disbursed accurately and timely; and

3.      This Order is effective immediately upon signing and shall remain in effect unless modified or vacated by the Commissioner.

4.      This Order shall not be construed as approving any act, practice, or conduct not specifically set forth herein which was, is, or may be in violation of relevant state or federal laws and regulations.

## NOTICE

Pursuant to N.C. Gen. Stat. § 53-244.113(b), Ocwen may, within 20 days of receiving this Order, submit a written request for a hearing before the Commissioner. Upon receipt of such a request, the Commissioner shall calendar a hearing within 15 days or at such time as the parties may mutually agree. If a hearing is not requested, this Order shall remain in full force and effect until it is modified or vacated by the Commissioner.

The Commissioner will post a copy of any final order or decision in this matter to the NMLS under regulatory actions which will be viewable by regulators and the public.

**IT IS SO ORDERED** on this the 20th day of April, 2017.

s/    Ray Grace
      Commissioner of Banks

6